IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

NIDIA I. TORO, INDIVIDUALLY     )     CIVIL NO. 03–00030 LEK
AND AS NEXT FRIEND FOR HER      )
MINOR SON, ALEJANDRO G. TORO,   )
                                )
          Plaintiffs,           )
                                )
      vs.                       )
                                )
UNITED STATES OF AMERICA,       )
                                )
          Defendant.            )
_____)

**COURT'S DECISION**

         This matter having come on before the Court for bench

trial from September 13 to 16, 2005 and from December 13 to 16,

2005, with Plaintiffs Nidia I. Toro, now known as Nidia Novak,

individually and as Next Friend for her minor son, Alejandro G.

Toro, now known as Alejandro Novak, (collectively "Plaintiffs")

being represented by William Copulos, Esq., and Joseph J. Mellon,

Esq., and Defendant United States of American ("Defendant") being

represented by Thomas A. Helper, Assistant United States

Attorney, the Court hereby outlines its decision.  Defendant is

instructed to prepare the proposed Findings of Fact and

Conclusions of Law ("FOF/COL") consistent with the Court's ruling

herein, and annotated to the record and the trial transcript, by

no later than June 30, 2006.  Plaintiffs may respond to those

portions of Defendant's proposed FOF/COL that they object to by

filing an alternative proposed FOF/COL, annotated to the record

and the trial transcript, addressing the portions objected to by
no later than July 21, 2006.

## BACKGROUND

The facts of this action involve perplexing symptoms,
years of medical treatment, and volumes of medical records.  At
its essence, this case consists of various allegations of medical
negligence under the Federal Tort Claims Act ("FTCA").
Plaintiffs allege that personnel at various Department of
Veterans Affairs ("VA") Medical Centers failed to properly
diagnose and treat Plaintiff Nidia Toro, now known as Nidia Novak
("Plaintiff Novak") in a timely manner over a period of more than
twenty years.  Plaintiffs claim that VA personnel: (1) failed to
diagnose and properly treat Plaintiff Novak for organic brain
injury as a result of a head injury she sustained in an
automobile accident on February 26, 1977, while she was on active
duty as an officer in the United States Army ("Army"); (2)
improperly diagnosed her with schizophrenia in 1981; (3) failed
to diagnose and properly treat her for organic brain injury as a
result of injury to her head that she suffered in an automobile
accident on May 30, 1986, while she was an officer on active duty
in the Army; (4) caused her to suffer post-traumatic stress
disorder ("PTSD") when she reviewed her entire VA medical file
and consulted with Harold Bursztajn, M.D., and realized that the
VA had mis-diagnosed her organic brain injury for many years; (5)

failed to obtain her informed consent for the hysterectomy procedure performed on June 18, 1996 at the VA Medical Center in Miami, Florida; (6) recommended an unnecessary hysterectomy procedure; and (7) performed the hysterectomy in a negligent manner. Plaintiffs allege that Defendant's negligent acts and omissions caused Plaintiff Novak severe and permanent injuries. They also allege that, as a direct result of Defendant's conduct, Plaintiff Alejandro suffered the loss of his mother's companionship and society.

Plaintiff Novak was commissioned as an officer in the United States Army on February 8, 1976. While on active duty, she was injured in an automobile accident on February 26, 1977 ("1977 Accident"). Plaintiff Novak left active duty on December 10, 1977, but remained an officer in the Army Reserves. From 1980 to 1983, she attended graduate school, eventually obtaining a Master's degree in Business Administration from Columbia University in 1983. She was employed with Chemical Bank in New York City from 1983 to 1986. In 1986, she was recalled to active duty for Reserves' training. On May 30, 1986, Plaintiff Novak was injured in an automobile accident ("1986 Accident"). Coincidentally, May 30, 1986 was the last day of her active duty service. She moved to Hawai`i shortly thereafter.

Plaintiff Novak's medical history is substantial. She has received medical care and treatment from numerous VA

providers, as well as private providers, in many locations from
the 1977 Accident until 1999.  Some of the relevant events
involving her medical treatment after the 1977 Accident are:
intensive outpatient treatment at the El Paso Mental Health
Center in Texas for psychological concerns in January and
February 1979; admission to the Albuquerque VA Medical Center for
three weeks of psychological treatment in May 1980; admission to
the New York Psychiatric Institute in December 1980 for three
weeks for depression; and admission to the Columbia Presbyterian
Medical Center in January 1981.  In 1981, Plaintiff Novak filed a
disability benefits claim for depression, which she alleged was
connected to her military service.  In connection with her claims
evaluation, Frank Curran, M.D., of the VA Clinic in Manhattan,
administered a psychiatric exam to Plaintiff Novak on July 29,
1981.  He diagnosed her as suffering from schizophrenia and
schizoaffective type.  [Tr. Exh. 2 at 2810-11.]

        Following the 1986 Accident, Plaintiff Novak sought
chiropractic care from a chiropractor in private practice from
August 1986 to February 1987.  [Id. at 2743.]  In September 1986,
she filed a claim for VA benefits for back pain.  [Tr. Exh. 1 at
02758-59.]  In August 1987, she was evaluated for in vitro
fertilization by Straub Clinic and Hospital ("Straub"), and her
subsequent pregnancy was confirmed in September 1987.  [Tr. Exh.
15 at 386.]

4

On September 11, 1987, she began to complain of jaw pain and headaches resulting from the 1986 Accident, [Tr. Exh. 1 at 02278,] and submitted a supplemental VA claim for this condition. [Tr. Exh. 2 at 2712.] She apparently did not present herself to the VA for treatment of her injuries from the 1986 Accident until November 19, 1987 when she first sought treatment for neck, back, and Temporomandibular Joint ("TMJ") pain. [Tr. Exh. 1 (vol. 1) at 02147-48.] At the VA compensation review on April 15, 1988, she complained of neck, shoulder, back pain, and TMJ syndrome. [Tr. Exh. 1 at 02020-21.] On May 19, 1988, she gave birth to her son. [Tr. Exh. 15 at 383.]

On January 6, 1990, Plaintiff Novak filed a claim for increased compensation based on unemployability due to pain in her jaw, shoulder, arm, leg, and back. [Tr. Exh. 2 at 2643-44.] She went to the Queen's Medical Center emergency room on February 14, 1990 and reported depression and thoughts of suicide. [Tr. Exh. 18 at 253.] On September 24, 1990, she sought treatment at the Miami VA for chronic neck and back pain. [Tr. Exh. 1 at 01425.]

Plaintiff Novak visited the Vet Center, a VA walk-in facility in Honolulu, on January 14, 1991 and inquired about post-traumatic stress, [Tr. Exh. 19 at 3,] and returned on February 15, 1991 with a concern about having PTSD. On February 26, 1991, she saw Frederick Tamayo, Ph.D., a

neuropsychologist at the VA, for complaints of memory loss and emotional distress associated with the 1986 Accident. Dr. Tamayo assessed her as having cerebral inefficiencies consistent with the residual effects of the accident. [Tr. Exh. 2 at 3202-05.] On April 30, 1991, Plaintiff Novak was seen at the VA facility by nurse Louise Thomas, who consulted with Maurice Sprenger, M.D. Dr. Sprenger diagnosed Plaintiff Novak as having suffered a brain injury as a result of the 1986 Accident. [Tr. Exh. 1 at 02116.]

On November 18, 1995, Plaintiff Novak reported chronic left pelvic pain. As a result, a diagnostic laparoscopy was performed at Kapi`olani Medical Center in Honolulu, Hawai`i, and several adhesions were removed. [Tr. Exh. 205 at 36-37.] After moving to Florida, she went to the Miami VA Medical Center's emergency room on January 16, 1996 with complaints of left lower quadrant pain radiating to her left leg. [Tr. Exh. 1 (vol. 5) at 01198.] On January 19, 1996, she was seen at the Miami VA's Women's Health Clinic with complaints of abdominal pain. A pelvic sonogram taken on February 7, 1986 indicated "[p]robable pelvic adhesions". [Id. at 01042.] On June 18, 1996, Plaintiff Novak underwent a hysterectomy procedure at the Miami VA Medical Center in which her uterus and ovaries were surgically removed.

Plaintiff Novak filed several disability claims with the VA. Among the VA's decisions on her claims are: (1) on July 24, 1987, the VA issued a ten percent disability rating

attributed to cervical strain from the 1986 Accident; [Tr. Exh. 2 at 2736–37;] (2) on May 31, 1988, the VA issued a thirty percent disability rating from the 1986 Accident; [Tr. Exh. 1 at 02734–35;] (3) on March 8, 1990, the VA issued a sixty percent disability rating, with forty percent attributed to lumbosacral strain and twenty percent attributed to cervical strain, and denied a claim for unemployability; [Tr. Exh. 2 at 2632–36;] (4) on January 2, 1991, the VA denied her renewed claim for unemployability; [id. at 3307;] (5) on August 26, 1991, the VA issued a total disability rating of eighty percent, taking into account her dementia due to a closed head injury, cervical strain, lumbrosacral strain, and TMJ syndrome from the 1986 Accident; [id. at 3180–82;] (6) on January 27, 1993, the VA issued a one hundred percent disability rating due to dementia; [id. at 2945–47].

On May 9, 1999, Plaintiff Novak filed a Standard Form 95–108 with the VA, which was received on May 10, 1999. Plaintiff Novak filed another Standard Form 95–108 on behalf of her son, which the VA received on January 27, 2000. The VA failed to make a final disposition of these claims within six months of filing, rendering these claims denied. See 28 U.S.C. § 2675(a). Plaintiffs filed the instant action on May 21, 2002 in the United States District Court for the Southern District of Florida, Miami Division. The matter was transferred to the

District of Hawai`i on January 22, 2003.  Defendant's motion to
dismiss was granted in part and denied in part by the district
court on September 19, 2003.  The parties filed their written
consent to trial by magistrate judge on February 16, 2005.

        This Court has jurisdiction over this matter pursuant
to 28 U.S.C. § 1346(b)(1) and 28 U.S.C. § 2671, *et seq.*

                          **DISCUSSION**

I.    **Feres Doctrine Ruling**

        Plaintiff Novak was involved in an automobile accident
on February 26, 1977.  At the time, she was an officer in the
Army and on active duty.  Plaintiff Novak left active duty on
December 10, 1977, but remained an officer in the Army Reserves.
[Tr. Exh. 2 at 2910.]  In January 1986, Plaintiff Novak returned
to active duty for Reserves' training.  [Id. at 2747.]  While on
active duty, she was involved in an automobile accident on
May 30, 1986, which was also her last day of active duty.
Plaintiff Novak, however, apparently remained an officer in the
Army Reserves until she was found medically unfit for duty in
July 1989.  [Id. at 2627-28.]  Harold Bursztajn, M.D.,
Plaintiffs' expert witness, testified that Defendant failed to
timely diagnose Plaintiff Novak's organic brain injury caused by
the two automobile accidents.  He also testified that, because
Defendant failed to provide proper therapy and treatment in a
timely manner, Plaintiff Novak's brain injury worsened, resulting

                                8

in a severe decline in her cognitive and physical functioning, and causing her to suffer trauma sufficient to trigger PTSD when she realized that her organic brain injury had gone undiagnosed and untreated for many years.

In Feres v. United States, the United States Supreme Court held that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." 340 U.S. 135, 146 (1950). A serviceman's injury is "incident to service" if it arises "because of his military relationship with the Government[.]" United States v. Johnson, 481 U.S. 681, 689 (1987). The rationales behind the Feres doctrine are: 1) the distinctly federal nature of the relationship between the government and members of the armed services; 2) the generous statutory disability and death benefits available to service members, including the Veterans' Benefits Act; and 3) the potentially negative effect such lawsuits would have on military discipline and effectiveness. See id. at 688–90. The Feres doctrine does not distinguish between the varying levels of culpability, i.e. recklessness, negligence, or intent. See Broudy v. United States, 661 F.2d 125, 127 n.4 (9th Cir. 1981). This doctrine applies to both those on active duty in the military and those serving in the military reserves or national guard. See Jackson v. United States, 110 F.3d 1484, 1489 (9th

Cir. 1997) (<u>Feres</u> doctrine barred suit under the FTCA by member of the Naval Reserve); <u>see also</u> <u>Quintana v. United States</u>, 997 F.2d 711, 712 (10th Cir. 1993) (reserve status national guard member barred from bringing FTCA medical malpractice claim).

Plaintiff Novak claims that Defendant's alleged failure to diagnose and/or properly treat her organic brain injury in a timely manner impaired her cognitive and physical functioning, and that her impairments worsened over time. First, the Court finds that any brain injury Plaintiff Novak sustained in either the 1977 Accident or the 1986 Accident occurred as a result of activity that was incident to her military service. Defendant, therefore, is not liable for such brain injury, in and of itself. Further, the <u>Feres</u> doctrine "treats the initial injury and the medical care as two segments of a single episode." <u>Brown v. United States</u>, 151 F.3d 800, 806 (8th Cir. 1998); <u>see also</u> <u>Kendrick v. United States</u>, 877 F.2d 1201, 1203 (4th Cir. 1989) ("It is well established that receipt of medical care in military facilities by members of the military on active duty is 'activity incident to service' and thus a lawsuit against the United States arising from medical treatment of a service member on active duty is barred under <u>Feres</u>." (citations omitted)). Thus, any aggravation of her brain injury that Plaintiff Novak suffered during her military service as result of the treatment of her injuries from the accidents is also deemed to have arisen out of

service-related activity.  The Court therefore finds that, to the extent that Plaintiffs claim that Defendant is liable for medical negligence for its failure to diagnose and/or treat Plaintiff Novak's organic brain injury from February 26, 1977 to July 1989, this claim is barred by the <u>Feres</u> doctrine because the injuries she suffered were incurred as a result of activities that were incident to her military service, either on active duty in the Army, or in the Army Reserves.

Once Plaintiff Novak was discharged from the Army Reserves, however, any impairments in her cognitive and physical functioning that occurred as a result of Defendant's alleged failure to diagnose and/or properly treat her injuries were not incident to her military service.  <u>See</u> <u>United States v. Brown</u>, 348 U.S. 110 (1954) (holding that <u>Feres</u> does not bar a veteran's medical malpractice claim where he was injured seven years after his discharge from the military in a VA hospital while seeking treatment for a service-connected disability).[1]  Thus, Plaintiff

_____

[1] Brown, a discharged veteran, underwent two operations to treat a knee injury he suffered during active duty.  He alleged that during the second operation, the VA used a defective tourniquet that resulted in serious and permanent damage to his leg.  <u>See</u> <u>United States v. Brown</u>, 348 U.S. at 110-11.  The Supreme Court held that Brown's FTCA suit was not barred by the <u>Feres</u> doctrine because Brown's injury occurred after his discharge from military service.  The Supreme Court acknowledged that the surgery took place in a veteran's hospital because of Brown's service and that his injury occurred during service, but stated that this type of claims "is not foreign to the broad pattern of liability which the United States undertook by the
(continued...)

11

Novak's medical malpractice claims for the failure to diagnose and treat her brain injury after July 1989 are not barred by the Feres doctrine.

## II.  Statute of Limitations

Plaintiff Novak filed her administrative claims in 1999 and 2000.  Under 28 U.S.C. § 2401(b), claimants are required to submit their administrative claims within two years after the claims accrued.  Defendant argues that Plaintiffs' claims in the instant case are barred by the statute of limitations because Plaintiff Novak did not bring her administrative claims within the two-year period.

A medical malpractice claim brought under the FTCA accrues when the plaintiff discovers, or should have discovered with reasonable diligence, the existence of her injury and its cause.  See United States v. Kubrick, 444 U.S. 111, 119-22 (1979); Davis v. United States, 642 F.2d 328, 331 (9th Cir. 1981)).  Where the plaintiff alleges a failure to properly diagnose or treat, the injury is the development of the problem into a more serious condition.  See Augustine v. United States, 704 F.2d 1074, 1078 (9th Cir. 1983).

In the present case, Plaintiff Novak alleges that she developed more serious medical problems because of the VA

---

[1](...continued)
Tort Claims Act."  See id. at 112.

12

doctors' failure to properly diagnose and treat her organic brain injury. Her claim accrued when she became aware, or should have become aware, that her pre-existing condition had developed into a more serious condition because of the VA doctors' failure to properly diagnose and treat her. [Order Granting in Part and Denying in Part Defendant United States' Motion to Dismiss or in the Alternative Transfer this Matter to the Southern District of Florida, filed September 19, 2003, at 10-11.] In denying the motion to dismiss, the district court noted that Plaintiff Novak alleges that her mis-diagnosed, pre-existing condition is the organic brain injury she allegedly suffered in the 1977 Accident. Plaintiff Novak alleges that she did not become aware that her brain was injured in the 1977 Accident until 1999. The district court stated that these facts, if true, mean that the limitations period did not start until 1999. [Id. at 12.] The district court acknowledged that, by 1992, Plaintiff Novak was aware that she was brain injured and that she may have suffered an actionable injury as a result of a mis-diagnosis following the 1986 Accident. This, however, does not mean that Plaintiff Novak was aware of her injury in the 1977 Accident. [Id. at 13.] The district court ruled that Defendant did not establish that Plaintiff Novak had "means of knowing" that her injury derived from the 1977 Accident prior to 1999. Drawing inferences in Plaintiffs' favor, the district court found that Plaintiff Novak

13

"arguably had no reason to know of a pre-existing condition that had worsened in the period after 1977.  Therefore, her possible injury in the 1986 accident does not defeat her claims based on the 1977 accident."  [Id. at 15.]  The district court also ruled that Plaintiff Novak's PTSD claim did not accrue until she was diagnosed with PTSD in 1999.  [Id. at 16.]

        Diane Polakoff, Psy.D., stated in an August 23, 1996 progress note that Plaintiff Novak talked about an accident that occurred in approximately 1976 and about how it went undiagnosed and untreated until she sustained a second head injury approximately ten years later.  [Stip. Exh. 1 at 01400 (second of two pages numbered 01400).]  Plaintiff Novak testified that this might have been about the time that a spiritualist told her to look for the record about the accident.  A week before the date of Dr. Polakoff's note, Plaintiff Novak sent a letter to the VA requesting copies of her medical, psychiatric, hospital stay, laboratory, and other records.  [Tr. Exh. 209.]  Plaintiff Novak testified that this request was not prompted by a specific cause; she had always wanted to see her records.  In a November 22, 1996 progress note, psychologist Mary Sparks, Ph.D., stated that Plaintiff Novak reported that she had not had a certain problem prior to her "accidents", [Stip. Exh. 1 at 01390,] but Plaintiff Novak could not elaborate on that statement.  On January 24, 1997, Dr. Sparks noted that Plaintiff Novak "[w]as recently

14

reviewing documents which reminded her that she has been struggling with depression for 17 years." [Id. at 01382.] Plaintiff Novak could not say what this referred to. In his April 22, 1997 progress note, Ramon Boza, M.D., stated that Plaintiff Novak had a "history of head injuries, twice with episodes of partial amnesia and the like." [Id. at 01368.] Plaintiff Novak could not elaborate.

At trial, on September 14, 2005, Plaintiff Novak testified that she believes that she received her entire VA claims record, commonly referred to as the "C file", by June 27, 1997, the date of a progress note in her medical records which notes that traumatic brain injury occurred as a result of the two accidents. She did, however, also acknowledge that she testified in her deposition that she had the "C file" when she had her hysterectomy in 1996. Plaintiff Novak testified that files arrived piecemeal and that she didn't remember when the last file arrived. Even after she had all her files, it took her "a couple" or "a few" years for her to understand it all. She sought out a forensic psychiatrist to help her make sense of the files. As a result, she went to Dr. Bursztajn, who issued a report on March 4, 1999 based on his review of her records. Plaintiff Novak testified that she did not understand the implications of the C file until Dr. Bursztajn explained her brain injury and her PTSD.

Given the complex nature of Plaintiff Novak's injuries and the voluminous medical records involved, the Court concludes that the existence of her injuries and their cause was discovered by reasonable diligence in 1999 when she reviewed the records in conjunction with Dr. Bursztajn's report.[2]  Thus, the Court finds that Plaintiffs' claims, with the exception of the claims arising from Plaintiff Novak's hysterectomy which are analyzed separately below, are <u>not</u> time-barred.

## III. <u>Medical Negligence Claim - Schizophrenia Diagnosis</u>

Plaintiffs allege that Dr. Curran committed medical malpractice by erroneously diagnosing Plaintiff Novak with schizophrenia in 1981.  Dr. Curran conducted Plaintiff Novak's psychiatric examination in New York.  Under the FTCA, courts determine the United States' liability for damages based on the law of the state where the tortious act was allegedly committed. <u>See</u> <u>Hatahley v. United States</u>, 351 U.S. 173, 182 (1956) (citing 28 U.S.C. § 1346(b)(1)).[3]  New York law therefore applies to

---

[2] Based on Plaintiff Novak's testimony, she was clearly aware of the 1981 schizophrenia diagnosis well before 1997.  It can be argued, however, that her claim based on that diagnosis is not time-barred because she could not have realized that the diagnosis was erroneous until she reviewed her records with Dr. Bursztajn's report.  For the reasons discussed in section III, it is unnecessary to engage in a detailed analysis of whether Plaintiff Novak's medical malpractice claim arising from the schizophrenia diagnosis is time-barred.

[3] Section 1346(b)(1) states, in pertinent part:
    the district courts . . . shall have exclusive
                                    (continued...)

Plaintiff Novak's claim arising from the schizophrenia diagnosis.

Under New York law, a plaintiff cannot bring a medical malpractice action against a physician who examined her solely for an insurance evaluation because there is no physician-patient relationship under those circumstances. See Savarese v. Allstate Ins. Co., 731 N.Y.S.2d 226, 227 (App. Div. 2001); LoDico v. Caputi, 517 N.Y.S.2d 640, 642 (App. Div. 1987). In the present case, Dr. Curran examined Plaintiff Novak in connection with the evaluation of her benefits claim. His evaluation was made part of her claims file, not her medical file, and Plaintiff Novak's subsequent medical records do not refer to or rely upon Dr. Curran's opinion. As in the case of insurance evaluations, there was no physician-patient relationship between Dr. Curran and Plaintiff Novak. Plaintiff Novak therefore cannot bring a medical malpractice claim against Dr. Curran for erroneously diagnosing her with schizophrenia. The Court finds in favor of

---

[3](...continued)
        jurisdiction of civil actions on claims against
        the United States, for money damages, accruing on
        and after January 1, 1945, for injury or loss of
        property, or personal injury or death caused by
        the negligent or wrongful act or omission of any
        employee of the Government while acting within the
        scope of his office or employment, under
        circumstances where the United States, if a
        private person, would be liable to the claimant in
        accordance with the law of the place where the act
        or omission occurred.
28 U.S.C. § 1346(b)(1). The United States, however, cannot be
held liable for prejudgment interest or punitive damages. See 28
U.S.C. § 2674.

Defendant with regard to Plaintiffs' claim based on the
schizophrenia diagnosis.

IV. **Medical Negligence Claim — Traumatic Brain Injury[4]**

Plaintiff Novak tragically suffered a dramatic and
relentless decline in her cognitive and physical functioning.  In
the 1970's, she was a very fit, successful, energetic, and much
valued Army Officer.  Colonel Melvin Hunter, Plaintiff Novak's
former company commander, testified that "she was kind of a star
in the area of physical training" and that "[s]he was an
exceptional officer.  She stood out amongst the second
lieutenants."  [Depo. Testimony of Colonel Melvin Hunter, taken
July 18, 2005 ("Hunter Depo.") at 26:18-23, 41:11-12.]  He stated
that he thought she had the potential for a career in the
military and that he had no doubt that she would excel in
graduate school.  [Id. at 44:1-2, 14-19.]

Currently, Plaintiff Novak is unable to care for
herself and depends almost exclusively on her teenaged son to
assist her with daily activities such as grocery shopping, meal

---

[4] Plaintiffs' Complaint also alleges that, because Defendant
failed to properly diagnose Plaintiff Novak's brain injury for
all those years, it also failed to correctly explain her
condition and the available treatments.  Plaintiffs therefore
claim that Defendant failed to properly obtain her informed
consent to the various treatments Defendant rendered to her
throughout the years.  This is essentially a restatement of
Plaintiffs' claim that the alleged mis-diagnosis of her condition
constituted medical malpractice.  The Court therefore declines to
address the mis-diagnosis as a separate informed consent claim.

preparation, and cleaning.  She testified at length about the tremendous difficulties that she has with a myriad of problems, including chronic pain, panic attacks, and memory loss.

On September 14, 2005, she testified that she has refused to receive any medical care or treatment from any VA Medical Centers since 1999.  She had an esophageal attack after talking to a worker at a VA Medical Center, and thereafter would get panic attacks whenever she had contact with any VA facility. She also had a dispute with Maurice Sprenger, M.D., one of her treating psychiatrists concerning her refusal to take anti-psychotic medication.  Plaintiff Novak testified that she had to send her son to the VA pharmacy to pick up her medications because of her fear of the VA.  When she had to have contact with the VA, she would have full-fledged panic attacks and anger that would last for weeks.  Four years after her dispute with Dr. Sprenger, she moved to Australia because she feared the VA. She returned to Hawai`i after living in Australia for one year. When she returned, she sought private medical and psychiatric care from Shepard Ginandes, M.D.  Gretchen Stephens from the VA helped Plaintiff Novak obtain approval for some of items that her private doctors recommended, and her son would pick up her medications from the VA.  Plaintiff Novak could never go to the VA because of her panic attacks.  She subsequently left Hawai`i and resides in Australia.

Plaintiff Alejandro Novak's ("Plaintiff Alejandro") testimony confirms his mother's deterioration. At the time of trial, he was seventeen years old and had been caring for his mother for as long as he can remember. He handles responsibilities that would entirely overwhelm any grown person, much less a teenager. Plaintiff Alejandro testified about cooking, cleaning, picking up and checking medications, attending meetings with physicians, and intervening with personal care attendants on his mother's behalf. He also takes care of her service animals, does the shopping, and handles their monetary budget. Because Plaintiff Novak has moved several times to and from Hawai`i, Australia, Florida, and Puerto Rico over at least the last ten years, Plaintiff Alejandro's schooling and friendships have been terribly disrupted.

Dr. Bursztajn is a psychiatrist. [Tr. Exh. 35.] The Court finds that he is qualified to testify as an expert in psychiatry and brain injury. He administered a battery of tests to Plaintiff Novak. Dr. Bursztajn testified that Plaintiff Novak sustained traumatic brain injury from the automobile accidents, and that she suffers from organic brain syndrome and PTSD.[5] He based his conclusions on his review of her medical records, her

---

[5] Dr. Bursztajn's opinions regarding Plaintiff Novak's PTSD, as well as his opinions regarding her lack of informed consent claims, and his testimony on these issues are addressed in the sections pertaining to those claims.

performance on the tests that he administered, and his
observations of her.  He also testified that the deterioration in
her cognitive and physical abilities has been caused by
Defendant's failure to: (1) formulate a differential diagnosis;
(2) evaluate her timely and properly for traumatic brain injury;
and (3) understand the consequences of the eventual brain injury
diagnosis, made after fifteen years of not treating this injury.
He testified that Defendant's failure to diagnose brain injury
from 1987 to 1991 breached the standard of care because Defendant
failed to review Plaintiff Novak's VA medical records as a whole,
and to administer appropriate tests based on her complaints and
symptoms during that time period.

          Defendant's expert witness, Igor Grant, M.D., is a
psychiatrist who specializes in neuropsychiatry and
neuropsychology.  [Tr. Exh. 203, 211, 212.]  The Court finds that
he is qualified to testify as an expert in psychiatry,
neuropsychiatry, and neuropsychology.  On September 15, 2005,
Dr. Grant testified that he could not find evidence of trauma to
support a diagnosis of traumatic brain injury.  He reviewed
Plaintiff Novak's medical records, conducted psychological tests
on her, and examined her.  Dr. Grant testified that Plaintiff
Novak is clearly suffering, and has undergone a significant
reduction in her social and occupational functioning, and in her
activities of everyday life.  He opined that the primary causes

of her condition are somatoform disorder and recurrent mood disorder. Dr. Grant testified that the results of the Minnesota Multiphasic Personality Inventory[6] that Plaintiff took in 2003 corroborate his conclusion that there is a strong likelihood that Plaintiff Novak has somataform disorder. He also opined that she does not have PTSD.

Dr. Grant testified that Plaintiff Novak's IQ test results between 1989 and 1991 demonstrated a decline from normal range to borderline mental retardation. In 1989, Dr. Tamayo estimated Plaintiff Novak's IQ score to be 104, which is in the average range. Two years later, her score was 85, which is in the borderline retarded range. [Tr. Exh. 211 at 4.] However, Dr. Grant also noted that Plaintiff Novak's IQ was 101 in 1998 and 78 in 1992.

Mary Wilkowski is an attorney who has a solo law practice in Hawai`i. She met Plaintiff Novak in 1986 at a club. Within a week, they had developed a romantic relationship and Ms. Novak moved into Ms. Wilkowski's residence. They lived together for about two to three months, approximately from September to November 1986, until Plaintiff Novak moved out. They continued to see one another and would play racquetball together, but they were no longer lovers. Their relationship ended sometime in

---

[6] The Minnesota Multiphasic Personality Inventory is a standardized personality test.

January 1987 after an argument that they had after a racquetball game. Ms. Wilkowski admitted that she felt active dislike for Plaintiff Novak when their relationship ended. Ms. Wilkowski did not see her again until December 20, 1988 when Ms. Wilkowski was called to testify at a deposition in a Virginia state lawsuit that Plaintiff Novak filed based on the 1986 Accident.

On December 14, 2005, Ms. Wilkowski testified that Plaintiff Novak told her that she (Plaintiff Novak) had been in an automobile accident in Virginia on her last day as an Army officer when another vehicle tapped the back of the automobile that she was driving. Ms. Wilkowski testified that Plaintiff Novak told her in several conversations that she (Plaintiff Novak) was making a claim for damages, and that she had an arrangement with the chiropractor who was treating her for injuries sustained in this automobile accident. Plaintiff Novak said that the chiropractor would record that he treated her regardless of whether or not she showed up for treatment. Ms. Wilkowski testified that Plaintiff Novak said that this was an opportunity to make money and that she had filed a lawsuit in Virginia. As a result, Plaintiff Novak and Ms. Wilkowski had arguments about opportunism and deceit. When they were living together, Ms. Wilkowski called Plaintiff Novak's insurer to report Plaintiff Novak for claim fraud. Ms. Wilkowski was never contacted by any insurance commissioner or state agency

investigating this report.

Ms. Wilkowski recalled that Plaintiff Novak played pool, danced, ran, swam, threw coconuts to her dog, played racquetball, and made love.  She does not recall how often Plaintiff Novak would jog, swim or walk but recalled that Plaintiff Novak walked more frequently than swam or jogged. Ms. Wilkowski testified that she played racquetball with Plaintiff Novak at the Honolulu Club.  She never observed Plaintiff Novak to be injured nor did Plaintiff Novak claim to be injured.  There were no complaints of neck, jaw, or shoulder pains, or any sort of pain at all.  According to Ms. Wilkowski, Plaintiff Novak only had a problem with her memory when she was drinking.  Ms. Wilkowski recalled seeing Plaintiff Novak once or twice having twelve to fourteen drinks in one night. Ms. Wilkowski testified that Plaintiff Novak went out three to four times a week, and that alcohol would reek from Plaintiff Novak's pores in the mornings after she went out.  Other that at those times, Plaintiff Novak made no complaints about being forgetful or having problems understanding other people. Ms. Wilkowski never had a problem understanding Plaintiff Novak.

Dr. George Foster testified on December 15, 2005.  He is a retired chiropractor and currently resides in Kansas.  He does not recall Plaintiff Novak but has looked at his records for Nidia Toro.  [Tr. Exh. 216.]  These records are the narratives

that he used in his practice.  He has never had a complaint filed against him as a chiropractor nor has he been sued.

On February 26, 1991, Plaintiff Novak saw Dr. Tamayo, a neuropsychologist at the VA, for complaints of memory loss and emotional distress associated with the 1986 Accident.  He assessed her as having cerebral inefficiencies consistent with the residual effects of the accident.  [Tr. Exh. 2 at 3202-05.]

Maurice Sprenger, M.D., testified on December 14, 2005. He is a psychiatrist and is currently employed at the VA Center in Atlanta, Georgia.  He was previously employed at the VA Center in Hawai`i from 1988 to 2000.  Dr. Sprenger first saw Plaintiff Novak on April 30, 1991 at the request of Louise Thomas, a nurse practitioner.  He understood Plaintiff Novak's complaints to be that she had memory problems, concentration difficulties, and some irritability, and that Plaintiff Novak attributed these problems to a motor vehicle accident.  Because she also complained of symptoms that might have been seizures, he prescribed medication.  He ordered an EEG and CT scan because he was concerned that Plaintiff Novak was having memory difficulties at her age and he thought that a brain tumor or other disease should be ruled out.  His provisional diagnosis was "closed head injury".  The EEG showed slowing in some areas and the CT was not abnormal.  He thought Plaintiff Novak had some symptoms of post-concussion syndrome and assumed it was because of the 1986

25

Accident because of her history.  She did not recall clearly what happened in this accident.

Dr. Sprenger continued to see Plaintiff Novak until September 1991.  After consulting with Anthony Holzgang, M.D., who was the VA's brain specialist and who had expertise in brain injury, Dr. Sprenger transferred Plaintiff Novak to Dr. Holzgang's care at Tripler Army Hospital.

On November 10, 1994, Dr. Holzgang transferred Plaintiff Novak's care back to Dr. Sprenger because Dr. Holzgang was moving to Michigan.  They discussed Plaintiff Novak's condition and agreed that the head injury was the problem and that her continued dementia was permanent.  By July 29, 1995, Dr. Sprenger's assessment was "closed head injury – severe".  Dr. Sprenger saw Plaintiff Novak on November 11 and 30, 1995, and then did not see her again until March 18, 1999.  At that time, she told him that she was moving to Mau`i.  He saw her next on June 30, 1999 and she told him that she had moved back from Mau`i.  By that point, he had worked with her off and on for years and was seeing a pervasive pattern beyond the organic brain disorder.  In particular, she would attach herself to one person, but, if they said anything that she did not like, then she would vilify them.  She was impulsive in moving to different places, and had difficulty maintaining relationships.  Her moods changed very rapidly.

Plaintiff Novak's last visit with Dr. Sprenger was on September 28, 1999. She had reviewed some of her experiences in Miami and had become more agitated. She was angry about the VA losing her records and it seemed that the VA was becoming the bad person in her life. Plaintiff Novak demanded to be tested for PTSD. She seemed relieved and pleased about the diagnosis of brain trauma because she had something that could explain her symptoms. She told him that the VA was going to pay for what they were doing to her, that she was going to seek private care, and that the VA was going to pay for it. He disagreed with her and told her that the VA could pay for outside treatment on a fee basis, but it would not happen just because she wanted it.

During the time that Dr. Sprenger saw Plaintiff Novak, he never saw her being scared of the VA. He found that she never had problems coming in and asking for what she wanted, but she was not forthcoming when he would request information. For example, she would refuse to discuss childhood trauma history with him. When asked about her medical history, she repeatedly told him that she had no hospitalizations, no psychiatric history, and no suicide attempts.

A.     **Applicable Law**

In negligence actions brought under the FTCA, the United States is liable only where a private person would be liable for the same act or omission under the laws of the state

27

within which the act or omission occurred.  See 28 U.S.C. §§ 1346(b)(1), 2674.  Plaintiff Novak's medical malpractice claim is based upon the VA's failure to diagnose and treat her traumatic brain injury as caused by the 1977 Accident and the 1986 Accident.  Her remaining claim is based on medical care and treatment she received from VA medical providers in Hawai`i and Florida after she was medically discharged from the Army Reserves in 1989.

    **1.**   **Hawai`i law**

      Under Hawai`i law, a plaintiff in a medical malpractice case must establish that: the defendant owed a duty to the plaintiff; the defendant breached that duty; and there is a causal relationship between the defendant's breach and the plaintiff's injury.  See Bernard v. Char, 79 Hawai`i 371, 377, 903 P.2d 676, 682 (Ct. App. 1995).  Hawai`i courts generally require expert medical testimony to establish negligent treatment because "lay jurors are ill prepared to evaluate complicated technical data for the purpose of determining whether professional conduct conformed to a reasonable standard of care and whether there is a causal relationship between the violation of a duty and an injury to the patient."  Id. (quoting 4 F. Lane, Lane Medical Litigation Guide § 40.14, at 54 (1993)) (some citations omitted).  Further, the expert cannot merely testify that he would have treated the patient in a particular manner;

the expert must testify "that the defendant's treatment deviated
from any of the methods of treatment approved by the standards of
the profession." Id. (citing 3 F. Harper, F. James, Jr. & O.
Gray, The Law of Torts § 17.1, at 554-44 (2d ed. 1986)).

    2.  **Florida law**

        Similarly, a plaintiff in a medical malpractice action
under Florida law must establish: the standard of care owed by
the physician; that the physician breached his duty to provide
care in accordance with that standard; and that the breach was
the proximate cause of the plaintiff's injury. See Torres v.
Sullivan, 903 So.2d 1064, 1067 (Fla. Dist. Ct. App. 2005). "The
prevailing professional standard of care for a given health care
provider shall be that level of care, skill, and treatment which,
in light of all relevant surrounding circumstances, is recognized
as acceptable and appropriate by reasonably prudent similar
health care providers." Fla. Stat. § 766.102(1).

        The standard of care in a particular medical field
under a given set of circumstances is not within a layman's
expertise or comprehension. Florida courts have therefore held
that expert testimony is necessary to establish the standard of
care in a particular medical field. See Torres, 903 So.2d at
1067-68. Under Florida law, the expert witness need not practice
in the same specialty area as the physician accused of
malpractice. See Loadholtz v. Andrews, 855 So.2d 1241, 1243

(Fla. Dist. Ct. App. 2003).  Florida Statutes § 766.102(2)(c)

(1996)[7] provides:

> The purpose of this subsection is to establish a
> relative standard of care for various categories
> and classifications of health care providers.  Any
> health care provider may testify as an expert in
> any action if he or she:
>
>> 1.  Is a similar health care provider
>> pursuant to paragraph (a) or paragraph (b);
>> or
>>
>> 2.  Is not a similar health care provider
>> pursuant to paragraph (a) or paragraph (b)
>> but, to the satisfaction of the court,
>> possesses sufficient training, experience,
>> and knowledge as a result of practice or
>> teaching in the specialty of the defendant or
>> practice or teaching in a related field of
>> medicine, so as to be able to provide such
>> expert testimony as to the prevailing
>> professional standard of care in a given
>> field of medicine.  Such training,
>> experience, or knowledge must be as a result
>> of the active involvement in the practice or
>> teaching of medicine within the 5-year period
>> before the incident giving rise to the claim.

Fla. Stat. § 766.102(2)(c) (1996).

## B.  **Breach of Standard of Care and Causation**

The key factual issue at the heart of most medical

malpractice claims is: what caused the plaintiff's injury?  At

---

[7] The comparable provision in the current version of the statute is § 766.102(5).  Amendments to § 766.102(2)(c) took effect on September 15, 2003.  The Florida legislature intended that the amendments would apply to prior medical incidents, but only where the notice of intent to initiate litigation was mailed on or after the amendments' effective date.  See Loadholtz, 855 So.2d at 1243 n.2 (citing Ch. 2003-416, §§ 48, 86, Laws of Fla.). In the instant case, Plaintiffs initiated the litigation well before September 15, 2003.

its core, this case is no different, but it is perhaps one of the most bewildering. Plaintiff Novak's symptoms, physical and psychological test results, and medical history are confounding and often contradictory. In the end, the Court is constrained to hold Plaintiffs to their burden, both under Hawai`i and Florida law, to prove the elements of breach of the standard of care, and causation. This Court concludes that Plaintiffs have not established by a preponderance of the evidence that Plaintiff Novak exhibited symptoms of traumatic brain injury after the 1986 Accident and before seeing Drs. Tamayo and Sprenger in 1991. Insofar as Plaintiffs cannot demonstrate that Plaintiff Novak exhibited symptoms of a traumatic brain injury in the period immediately following the 1986 Accident, they cannot prove that Defendant breached any standard of care by failing to make that diagnosis prior to 1991. Nor have Plaintiffs proven that Plaintiff Novak's current condition is caused by Defendant's failure to diagnose and treat her traumatic brain injury in a timely manner.

       1.   <ins>**Testimonies of Drs. Sprenger and Bursztajn**</ins>

      Dr. Sprenger testified that typically the first year is the critical time for providing intensive therapy to brain injured patients and, after that time, there are minimal gains. Dr. Bursztajn testified that failure to recall an automobile accident is an indication of potential traumatic brain injury,

that complaints of fatigue and dizziness are classic symptoms of mild traumatic brain injury, and that people with traumatic brain injury are particularly vulnerable to anxiety, fear, and horror.

>    2.    **Testimony of Ms. Wilkowski**

Ms. Wilkowski testified that, in the year following the 1986 Accident, Plaintiff Novak did recall this accident, was physically and socially active, and did not have any memory problems or difficulties in being understood or understanding others.  While Ms. Wilkowski admittedly had strong negative emotions about Plaintiff Novak when they ended their relationship, their disagreeable situation happened eighteen years before Ms. Wilkowski testified at trial.  It is difficult to conclude that this witness would hold a grudge for eighteen years against someone with whom she had a romantic relationship that lasted less than four months, and who she only knew for about a year.  Rather, this Court finds Ms. Wilkowski's testimony to be credible and detailed.  Her recollections of Plaintiff Novak during the months following the 1986 Accident are critical and support the Court's finding that it is more than likely that Plaintiff Novak did not exhibit symptoms or problems that could be reasonably associated with traumatic brain injury.

Additionally, Plaintiff Novak's medical records in the four-year period following the 1986 Accident are instructive. Plaintiff Novak did not seek treatment for her injuries until she

saw a chiropractor on August 4, 1986, over two months after the accident. [Tr. Exh. 1 (vol. 1) at 02272.] She apparently did not present herself to the VA for treatment of her injuries until November 19, 1987 when she first sought treatment for neck, back, and TMJ pain. [Id. at 02147-48.] From May 30, 1986 to February 14, 1990 (when she went to the emergency room at Queen's Medical Center with reports of depression and thoughts of suicide, [Tr. Exh. 18, 253,]), Plaintiff Novak did not appear to have the symptoms or complaints that the expert witnesses testified are associated with traumatic brain injury. While Plaintiff Novak reported physical problems to the VA, she either failed to report or outright denied these complaints to her Straub physicians during the same time period.

Further, there is nothing in the record to support Plaintiffs' claim that, once the VA diagnosed Plaintiff Novak with a brain injury as a result of the 1986 Accident, it committed medical malpractice by failing to investigate her medical history and determine that the 1977 Accident was the original cause of her brain injury. In the years between the 1977 Accident and the 1986 Accident, Plaintiff Novak remained a high achiever, completing a master's degree and becoming a major in the Army. While Plaintiff Novak had psychological problems in the years following her discharge from active duty, these were not clearly linked to the 1977 Accident.

33

The Court concludes that Plaintiffs failed to establish that Plaintiff Novak exhibited signs or symptoms of traumatic brain injury prior to 1991 that should have alerted the VA to a possible diagnosis of traumatic brain injury.  Thus, Plaintiffs have failed to prove that Defendant breached the standard of care by failing to diagnose her brain injury prior to 1991.  Further, Plaintiffs also failed to establish that the 1991 diagnosis should have prompted Defendant to investigate whether Plaintiff Novak suffered traumatic brain injury as a result of the 1977 Accident.  It stands to reason then that, because Plaintiffs cannot prove that Defendant breached any standard of care by failing to make such diagnoses, they cannot prove that Defendant's breach caused Plaintiff Novak's injuries.  The Court therefore finds for Defendant on Plaintiffs' medial negligence claim based on traumatic brain injury.

## V.    Medical Negligence Claim – PTSD

Dr. Bursztajn testified that Plaintiff Novak had a subclinical form of PTSD in 1991.  By 1999, she received all of her medical records and had his report analyzing her records.  At that point, her PTSD became a full-blown condition, which was triggered when she realized that she had been mis-diagnosed all of these years and that she had lost fifteen to twenty years of her life because of the mis-diagnosis.  Dr. Bursztajn testified that, in his opinion, Plaintiff Novak's condition will only

34

improve if she receives care outside of the VA system.  He
further opined that, if she remains under the VA's care and
control, it is foreseeable that she will continue to deteriorate
and have to be prematurely institutionalized when her son leaves
her home.

Dr. Grant testified that Plaintiff Novak does not
suffer from PTSD because she does not meet the diagnostic
criteria.  In his view, there is no extraordinary event or trauma
that served as a trigger and therefore the diagnosis cannot be
supported.

Dr. Sprenger testified that he included PTSD in his
assessment for the first time following his March 18, 1999
telephone consultation with Plaintiff Novak, who had called him
from Florida.  He does not, however, know why he included PTSD in
his assessment.  In September 1999, at Plaintiff Novak's
insistence, he administered the PTSD checklist and she scored
seventy-nine on this test.  He considered this score to be
marginal because any score over seventy-five is considered to be
indicative of PTSD.

As the Court has concluded that Plaintiffs have not
demonstrated that Defendant breached the standard of care by
failing to make a timely diagnosis of traumatic brain injury, it
likewise follows that this Court must find that Plaintiffs have
not proven that Defendant's failure to timely diagnose Plaintiff

Novak's traumatic brain injury caused her to develop full-blown PTSD. The Court therefore finds in favor of Defendant on the medical negligence claim for PTSD.

## VI.  Informed Consent Claim

On June 18, 1996, Plaintiff Novak underwent a hysterectomy procedure at the VA Medical Center in Miami, Florida. Plaintiff Novak testified that she was not advised of the risks involved. In particular, she claims that she was not told that she could still have pelvic adhesions after the surgery, which could cause her pain symptoms to return. Plaintiff Novak testified that, if she had been given all of the information about the associated risks, she would not have submitted to the procedure.

On September 15, 2005, Joy Dy Buco, a nurse practitioner and the coordinator for the Women's Wellness Center and for the Gynecology Clinic for the VA Medical Center in Miami, Florida, testified that she examined Plaintiff Novak on March 29, 1996 and scheduled her for a follow-up with Ara Nisanian, M.D. Subsequently, Dr. Nisanian suggested a hysterectomy and removal of the fallopian tubes. Ms. Dy Buco testified that she had heard Dr. Nisanian speak to patients more than fifty times about the risks associated with a hysterectomy procedure, and that he told Plaintiff Novak about the risks of the hysterectomy, including that she may need hormone replacement therapy and about scar

36

tissue.  Ms. Dy Buco also testified that she was not aware that Plaintiff Novak was being seen as a patient at the Mental Health Clinic of the VA Medical Center in Miami.

Dr. Nisanian testified on September 15, 2005.  He testified hat he told Plaintiff Novak about the risks of the surgical procedure and the anesthesia and that she would have to take hormone replacement therapy because her ovaries would be removed.  He admitted that he did not have an independent recollection of telling Plaintiff Novak these things, but stated that he must have done so because he has performed thousands of hysterectomies and that it was his standard practice to explain the procedure's risks and consequences to the patients. Dr. Nisanian also testified that he did not know about Plaintiff Novak's psychiatric history.

Dr. Bursztajn testified that, at the time of the procedure, Plaintiff Novak was under the care of a psychiatrist. In his opinion, the applicable standard of care required the surgical staff to obtain a psychiatric consult before preforming the hysterectomy on Plaintiff Novak.  Further, if the psychiatrist learned about the pending procedure, the applicable standard of care required the psychiatrist to get Plaintiff Novak's permission to consult with the gynecologist about her ability to give informed consent.

A.    **Statute of Limitations**

Plaintiff Novak filed her administrative claims on May 9, 1999 and in 2000.  Under 28 U.S.C. § 2401(b), she was required to submit her administrative claims within two years after the claims accrued.  For Plaintiff Novak's claim for lack of informed consent to the hysterectomy procedure performed on June 18, 1996, the statute of limitations commenced when (1) the injury manifested itself, and (2) the facts about the injury's cause became available to the plaintiff.  See United States v. Kubrick, 444 U.S. 111, 122 (1979); see also Augustine v. United States, 704 F.2d 1074, 1078 (9th Cir. 1983) (holding that a claim accrues when "'the plaintiff has discovered, or in the exercise of reasonable diligence, should have discovered, both his injury and its cause.'" (quoting Davis v. United States, 642 F.2d 328, 331 (9th Cir. 1981))).

Plaintiff Novak claims that she was not informed of the risk that the hysterectomy might not eliminate her pelvic pain and that, if she had known of this risk, she would not have undergone the procedure.  On January 28, 1997, Plaintiff Novak complained that her pelvic and abdominal pains had returned. [Tr. Exh. 1 at 01381.]  Plaintiff Novak was seen for pelvic pain on April 24, 1997, and the physician noted that she may have "pelvic pain syndrome".  [Id. (vol. 4) at 01366.]  Plaintiff Novak knew or should have known by April 24, 1997 that the

38

hysterectomy did not eliminate her pelvic pain and she therefore
knew or should have known about her claim for lack of informed
consent.  Plaintiff Novak failed to bring her administrative
claim with in two years of that date.  Accordingly, the Court
finds that Plaintiff Novak's claim for lack of informed consent
is time-barred.

      B.    **Florida Law**

      For sake of completeness, this Court examines Plaintiff
Novak's claim for lack of informed consent to the hysterectomy
procedure.  The Court finds that, even if Plaintiff Novak's claim
for lack of informed consent is not time-barred, this claim
fails.

      In light of 28 U.S.C. § 1346(b)(1), the Court finds
that Florida law must be applied as to Plaintiff Novak's claim
for lack of informed consent.  Florida courts recognize lack of
informed consent as a separate theory of liability from the
negligent performance of a surgical procedure.  See Chua v.
Hilbert, 846 So.2d 1179, 1182 (Fla. Dist. Ct. App. 2003).  At the
time of Plaintiff Novak's hysterectomy, Florida's informed
consent statute provided, in pertinent part:

> (3) No recovery shall be allowed in any court in
> this state against any physician licensed under
> chapter 458 . . . in an action brought for
> treating, examining, or operating on a patient
> without his informed consent when:
>
>     (a)  1. The action of the physician . . . in
> obtaining the consent of the patient or another

person authorized to give consent for the patient
was in accordance with an accepted standard of
medical practice among members of the medical
profession with similar training and experience in
the same or similar medical community; and

2. A reasonable individual, from the
information provided by the physician . . . under
the circumstances, would have a general
understanding of the procedure, the medically
acceptable alternative procedures or treatments,
and the substantial risks and hazards inherent in
the proposed treatment or procedures, which are
recognized among other physicians . . . in the
same or similar community who perform similar
treatments or procedures; or

(b) The patient would reasonably, under all
the surrounding circumstances, have undergone such
treatment or procedure had he been advised by the
physician . . . in accordance with the provisions
of paragraph (a).

Fla. Stat. § 766.103 (1996).

In <u>Gouveia v. Phillips</u>, the Fourth District Court of
Appeals held that expert testimony is necessary for the trier of
fact to determine whether the physician's medical disclosure was
incorrect or incomplete in some way. <u>See</u> 823 So.2d 215, 228
(Fla. Dist. Ct. App. 2002). The court noted that "[o]nly
practitioners with knowledge about the medical subject involved
are competent to prescribe what information must be imparted. . .
. [T]he trier of fact will have to know what would be accurate or
adequate according to that physician's 'community' or specialty."
<u>Id.</u>

Dr. Bursztajn testified that, because Plaintiff Novak
was under psychiatric and psychological care at the VA Medical

40

Center, the surgical staff had a duty to seek a psychiatric

consult before performing the hysterectomy on Plaintiff Novak to

determine whether she had the capacity to consent to the surgery

and to rule out the possibility of PTSD.  Based on

Dr. Bursztajn's testimony, Plaintiffs argue that the VA's breach

of this duty rendered the attempt to obtain Plaintiff Novak's

informed consent incomplete or incorrect.  Dr. Bursztajn's is

qualified as an expert witness in psychiatry.[8]  However, he does

not have the knowledge and expertise sufficient to qualify him as

an expert in the field of gynecology or surgery.  See Living

Designs, Inc. v. E.I. DuPont de Nemours, 431 F.3d 353, 368 n.14

(9th Cir. 2005) (noting that, when determining the reliability of

proposed expert testimony concerning non-scientific issues,

courts must rely heavily on the expert's knowledge and expertise

rather than on the factors identified in Daubert v. Merrell Dow

Pharmaceuticals, Inc., 509 U.S. 579 (1993)).  This Court

therefore finds that Dr. Bursztajn's testimony regarding the

surgical staff's duty to obtain a psychiatric consult is not

credible.  Plaintiff Novak did not provide any other testimony in

support of her argument that the surgical staff was required to

seek a psychiatric consult in order to obtain her informed

consent to the hysterectomy.  This Court therefore finds that

---

[8] Dr. Bursztajn's opinions regarding the duties that
Plaintiff Novak's mental health providers owed her concerning her
ability to consent to the hysterectomy are discussed below.

Plaintiff failed to provide the required expert testimony
necessary to prove that the medical disclosure was incorrect or
incomplete because the surgical staff failed to obtain a
psychiatric consult.

Plaintiff Novak testified that she was not adequately
informed of the surgical risks, including that a hysterectomy was
likely to cause surgical adhesions and reoccurrence of the pelvic
pain.  Where the issue is merely a dispute over whether the
physician actually disclosed what he claims to have disclosed, no
expert testimony is required.  Such a decision is an ordinary
credibility determination that is within the trier of fact's
capabilities.  See Gouveia, 823 So.2d at 228.  Further, under §
766.103, a written consent that meets the requirements of
subsection (3), and was validly signed by the plaintiff or
another authorized person, creates a rebuttable presumption of
valid consent.  See Fla. Stat. § 766.103(4)(a).  "A valid
signature is one which is given by a person who under all the
surrounding circumstances is mentally and physically competent to
give consent."  § 766.103(4)(b).

Plaintiff Novak signed an informed consent form for the
hysterectomy surgery on June 13, 1996.  [Tr. Exh. 1 (vol. 8) at
01404.]  The form asks the patient to certify that: "The nature
of the proposed operation or procedure, possible alternative
methods of treatment, the risks involved, and the possibility of

complications have been fully explained to me.  I acknowledge
that no guarantees have been made to me concerning the results of
the operation or procedure."  [Id.]  This Court finds that the
written consent form that Plaintiff Novak executed meets the
requirements of § 766.103(3).  Thus, if Plaintiff Novak's
signature on the form is valid, it creates a rebuttable
presumption that she gave her informed consent.

     Plaintiffs' position is that Plaintiff Novak was not
mentally and physically competent to give her informed consent to
the hysterectomy.  The mere fact that Plaintiff Novak was under
psychiatric or psychological care during that time does not prove
that she was not competent to give her informed consent.  Both
Dr. Nisanian and Ms. Dy Buco testified that they were not aware
that Plaintiff Novak was a patient at the Mental Health Clinic.
Further, there is no indication in the medical records that
Plaintiff Novak told them about any psychiatric history or
complaints, or that she exhibited any signs that she was mentally
incompetent to give informed consent to the hysterectomy.

     Dr. Bursztajn testified that Plaintiff Novak's
psychiatrist had a duty to ask her permission to speak with her
gynecologist about her ability to give informed consent before
the hysterectomy.  Plaintiff Novak had a therapy session with
Dr. Sparks, a psychologist, on June 10, 1996.  Dr. Sparks noted
that Plaintiff Novak anticipated that her anxiety level would

43

increase after her surgery.  Dr. Sparks noted that they discussed

how Plaintiff Novak could minimize such anxiety, but there is

nothing in Dr. Sparks' note which indicates that Plaintiff Novak

may have been mentally incapable of giving informed consent.

[Tr. Exh. 1 at 01410.]  The treatment notes of the VA mental

health providers who treated Plaintiff Novak in the months

preceding the hysterectomy indicate that she experienced

depression, anxiety, and difficulty managing her emotions.  She

admitted having occasional suicidal thoughts, but said that she

would never act on them.  The Court finds that there is nothing

in the medical record which indicates that her condition was so

severe that she was not competent to make medical or treatment

decisions for herself.  The Court further finds that there was no

basis for Plaintiff Novak's psychologists and psychiatrists to

believe that she was incapable of giving informed consent to a

medical procedure.  The Court therefore rejects Dr. Bursztajn's

testimony that Plaintiff Novak's psychologists and psychiatrists

had a duty to consult with her gynecologist about her alleged

inability to give informed consent.

        Based on the record and the testimony of the witnesses,

the Court finds that Plaintiff Novak was mentally and physically

competent to give informed consent.[9]  Her informed consent form

_____

        [9] This Court is also persuaded by the fact that Plaintiff
Novak has undergone a number of plastic surgeries, including
                                        (continued...)

therefore creates a rebuttable presumption that she gave her informed consent to the hysterectomy procedure.  The Court further finds that Plaintiff Novak's testimony that the VA staff did not inform her of the risks and possible outcome of the procedure is not credible, and that Plaintiff Novak has not rebutted the presumption that she gave valid consent.  Based on the medical records and the testimony at trial, this Court finds that Plaintiff Novak was properly advised of the risks and likely outcomes of the procedure, and that she made a reasonable decision under the circumstances to undergo the surgery.  This Court therefore finds in favor of Defendant with regard to Plaintiff Novak's informed consent claim.

## VII. **Unnecessary Surgery and Negligent Performance Claims**

Plaintiffs also allege that Defendant's recommendation and performance of Plaintiff Novak's hysterectomy constituted medical malpractice because the procedure was medically unnecessary and that the procedure was performed in a negligent manner because her bladder was scrapped during the procedure.

---

[9](...continued)
procedures at the Miami VA Medical Center within approximately one year of the hysterectomy.  [Tr. Exh. 1 (vol. 8) at 01321 (August 28, 1997 neck liposuction), 01342 (August 15, 1997 liposuction to correct breast deformities).]  At trial, she admitted that she went through the informed consent process for the plastic surgeries.  Plaintiff Novak has not claimed that she was incapable of giving informed consent to those procedures.

A.    **Statute of Limitations**

As discussed above, Plaintiff Novak was required to submit her administrative claims within two years after her claims accrued.  On July 22, 1996, Plaintiff Novak told Joan Watson at the Honolulu VA that her bladder had been "scrapped" during the hysterectomy and that she was experiencing bladder discomfort.  [Tr. Exh. 1 at 01851.]  Thus, her claim that the hysterectomy was negligently performed accrued on later than July 22, 1996, by which time Plaintiff Novak's injury had manifested itself and she was aware of the facts that caused her injury.  See Kubrick, 444 U.S. at 122; Augustine, 704 F.2d at 1078.  The Court finds that Plaintiff Novak's negligent performance claim is time-barred because she failed to file her administrative complaint within two years of that date.  For the sake of completeness, however, the Court will address Plaintiffs' proof in support of this claim.

With regard to Plaintiff Novak's unnecessary surgery claim, it is unclear when the facts supporting this claim became available to her.  The Court will therefore assume for the sake of argument that Plaintiff Novak's administrative claim was timely.

B.    **Expert Testimony**

Under Florida law, a plaintiff must produce expert testimony to establish that a medical procedure was unnecessary.

46

See Borges v. Jacobs, 483 So.2d 773, 774 (Fla. Dist. Ct. App. 1986). Plaintiff was also required to produce expert testimony to establish the standard of care for the performance of the hysterectomy. See Torres, 903 So.2d at 1067-68. The only expert testimony Plaintiffs provided was that of Dr. Bursztajn. As stated above, Dr. Bursztajn is not an expert in gynecology or surgery. Plaintiffs therefore failed to carry their burden to provide qualified expert testimony that Plaintiff Novak's hysterectomy was medically unnecessary and that the hysterectomy was performed in a negligent manner. The Court therefore finds in favor of Defendant with respect to these claims.

## VIII.  Plaintiff Alejandro's Claim

Plaintiff Alejandro asserts a claim for loss of consortium. [Complaint at ¶ 41.] This claim is derivative of Plaintiff Novak's claim for personal injury. See Leslie v. Estate of Tavares, 91 Hawai`i 394, 403-04 n.11, 984 P.2d 1220, 1229-30 n.11 (1999) (citing Tabieros v. Clark Equip. Co., 85 Hawai`i 336, 361, 944 P.2d 1279, 1304 (1997) (noting that, "[u]nder Hawai`i law, a spouse's claim of emotional distress, based on an injury to her husband, is a 'derivative' claim sounding in tort" (citations omitted))). As Plaintiff Novak cannot recover for her claims, Plaintiff Alejandro is likewise precluded from recovery. See Omori v. Jowa Hawai`i Co., Ltd., 91 Hawai`i 146, 146-47, 981 P.2d 703, 703-04 (1999) ("'The majority

47

rule is that a plaintiff in a [derivative-injury tort] action can only recover if the tortious harm the [injured party] suffered would have entitled the [injured party] to maintain an action against the defendant.'" (quoting <u>Winters v. Silver Fox Bar</u>, 71 Haw. 524, 536, 797 P.2d 51, 56 (1990)) (alterations in original)). <u>Accord</u> <u>ACandS, Inc. v. Redd</u>, 703 So.2d 492, 493-94 (Fla. Dist. Ct. App. 1997) (noting that, under Florida law, a loss of consortium is a derivative claim that is dependent on the spouse's ability to recover in a cause of action against the same defendant). The Court therefore finds in favor of Defendant as to Plaintiff Alejandro's claim.

### CONCLUSION

The foregoing is an outline of the Court's decision. The record citations were provided for ease of reference and are not intended to be exclusive. Where there is a typographical or other error to, or omission of, the record or the trial transcript citation, the parties should seek and annotate the relevant portion. Defendant is instructed to prepare the proposed FOF/COL and to annotate the findings of fact to the portions of the record and the trial transcript that are consistent with the Court's outline herein. Defendant shall prepare and serve the proposed FOF/COL by no later than June 30, 2006, and Plaintiffs shall prepare and serve alternatives to those portions of the proposed FOF/COL to which Plaintiffs object

by no later than July 21, 2006.  The Court thereafter will issue
its FOF/COL.

In the event that the parties do not prepare and serve
proposed FOF/COL as ordered, this outline shall be deemed the
Court's findings of fact and conclusions of law.

**IT IS SO ORDERED.**

DATED AT HONOLULU, HAWAI`I, June 2, 2006.



_Leslie E. Kobayashi_
Leslie E. Kobayashi
United States Magistrate Judge

**NIDIA TORO, ETC., ET AL. V. UNITED STATES OF AMERICA; CIVIL NO.
03-00030 LEK; COURT'S DECISION**

49