COPULOS LAW FIRM, L.L.C.
WILLIAM COPULOS  4908-0
733 Bishop Street, Suite 1850
Honolulu, Hawaii  96813
Telephone:  (808) 536-0500
Fax: (808) 536-0021
Email: **wcopulos@copuloslaw.com**

    --AND--

SHUGHART THOMSON & KILROY, P.C.
JOSEPH J. MELLON
1050 Seventeenth Street, Suite 2300
Denver, Colorado  80265
Telephone: (303) 572-9300
Fax: (303) 572-7883
Email: **jmellon@stklaw.com**

ATTORNEYS FOR PLAINTIFFS


## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| NIDIA I.  NOVAK, now known as Nidia Novak, individually and as Next Friend for her minor son, ALEJANDRO G.  NOVAK, now known as Alejandro Novak, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | )<br>) Civil No.  CV03-00030 (LEK)<br>)<br>)<br>**) PLAINTIFFS' ALTERNATIVE**<br>**) TO THOSE PORTIONS OF THE**<br>**) DEFENDANT'S PROPOSED**<br>**) FINDINGS OF**<br>**) FACT/CONCLUSIONS OF LAW**<br>**) TO WHICH PLAINTIFFS**<br>**) OBJECT**<br>)<br>Magistrate Judge:  Leslie E. Kobayashi |

19342271.2

## INTRODUCTION

On June 2, 2006, this Court filed a document entitled "Court's Decision", wherein the Court outlined its decision and instructed Defendant to prepare a proposed findings of fact and conclusions of law ("FOF/COL") consistent with the Court's ruling and annotated to the record. Plaintiffs were given the option to respond to those portion of the Defendant's FOF/COL that they object to by filing an alternative proposed FOF/COL, annotated to the record and trial transcript. Defendants sought and received an extension to file its FOF/COL to July 14, 2006, and ultimately filed its FOF/COL on July 18, 2006, therein agreeing to an extension for Plaintiffs' response to August 8, 2006.

The Court instructed the defendant to file its FOF/COL and permissively allowed the Plaintiffs to respond. So that there is no confusion or suggestion of acquiescence in the Court's decision, Plaintiffs formally object to the Court's *Feres* Doctrine ruling, medical negligence claim-schizophrenia diagnosis ruling, medical negligence claim-traumatic brain injury ruling, consideration of the testimony of Mary Wilkowski, medical negligence claim-PTSD ruling, informed consent claim ruling, necessary surgery and negligent performance claims ruling, and the ruling on Plaintiff Alejandro Novak's claim for loss of consortium.

2

## A.  ALTERNATIVE AND/OR ADDITIONAL INTRODUCTORY FINDINGS OF FACT

1.    Plaintiff moved from Puerto Rico to New York at age 15, quickly learned the English language and became an honor student in high school. She received a full scholarship to Wesleyan University. (Trial Ex. 16 at 0009-013)

2.    Plaintiff attended Wesleyan from 1971 to 1975, and was described as a bright young girl with a very promising future (Trial Ex. 1 at 02555); very sociable, dedicated to learning, and was in the second class of women at the university (Id. at 02554); very organized, goal orientated, and articulate (Id.); showed a great deal of enthusiasm about college experience, personality that inspired and energized (Id. at 02552); was active in activities at school. (Trial Ex. 9 at 00559-60)

3.    On April 2, 1975, Plaintiff underwent a medical exam regarding enlistment in the army, and everything was normal. (Trial Ex. 2 at 2555-56)

4.    Between August 1976 and February 1977, Plaintiff served as the first female officer assigned to the transportation company, performed her duties in an outstanding manner and was ahead of most peers. (Id. at 3266-67)  Under the command of Colonel Melvin Hunter, she was described as possessing innate ability to quickly assess new situation or requirement, organize her thoughts, high standards, well organized, resilient, focused, intense, worked hard to achieve excellence in everything, one of the finest lieutenants that has ever worked for me. (Id. at 4120-21)

3

5.    Plaintiff received high performance ratings from other commanding officers, describing strong ambition, outstanding performance, boundless energy and enthusiasm, logical thinker, highest standards of morality, ethics, character and professionalism. (Trial Ex. 2 at 3262)(Id. at 4093)(Id. at 3252)

6.    On February 26, 1977, Plaintiff reported to the emergency room at Ft. Hood, Texas, after being involved in an automobile accident a day or two before that, while on leave. (Id. at 2570)

7.    Her commanding officer, Colonel Melvin Hunter, recalls that he was notified over the weekend that Plaintiff was injured, and that she was in the hospital. (Hunter Deposition, at 24, lines 3-8.)

8.    Colonel Hunter remembered that she had a neck injury and was wearing a neck brace. (Hunter Deposition at 27, lines 11-12.)

9.    Colonel Hunter recalled that it was less than 60 days, more like 30 days, before Plaintiff could get back to full duty after the accident. (Hunter Deposition at 32, lines 14-23.)

10.    On December 16, 1977, Plaintiff's final performance evaluation after being relieved from active duty showed that her performance declined. (Trial Ex. 2 at 4091-92)

11.    Plaintiff's stated goal upon leaving the military was to obtain an MBA from Columbia University in 1980. (Id. at 4327)

4

12.     Plaintiff testified that she had no past history of psychiatric problems, nor had she been diagnosed with any psychiatric problems prior to the 1977 accident. (September 13, 2005, p. 82, lines 12-24; <u>Id.</u> at p. 85, lines 7-13)

13.     After leaving the military, Plaintiff received psychiatric treatment in February or March 1978, at the Veterans Administration Hospital in Manhattan, New York. (Trial Ex. 2 at 2887)

14.     After leaving the military, Plaintiff first attended Bronx Community College for remedial classes beginning March 31, 1978. (<u>Id.</u> at 4309)

15.     In September or October 1978, Plaintiff received psychiatric treatment at the Veterans Administration Hospital in Batavia, New York. (<u>Id.</u> at 2887)

16.     In December 1978, Plaintiff received psychiatric treatment at the Veterans Administration hospital in San Juan, Puerto Rico. (<u>Id.</u>)

17.     On December 28, 1978, Plaintiff filed a medical certificate with the Army, complaining of depression and tension since army days. (<u>Id.</u> at 2868)

18.     On January 25, 1979, Plaintiff filed a request to reopen her claim with the Army for a nervous condition. (<u>Id.</u> at 2887)

19.     Between January 26, 1979 and February 27, 1979, Plaintiff received psychiatric treatment at the El Paso Center for Mental Health and Retardation. (Trial Ex. 13 at 021-27)

20.    On November 8, 1979, Plaintiff presented to the Veterans Administration Hospital in Albuquerque, New Mexico, asking to be seen by the psychiatry department and be followed for episodic depression. (Trial Ex. 6 at 38)

21.    On November 27, 1979, the Veterans Administration filed a notice of change of student status; non-attendance of class. (Trial Ex. 2 at 4287)

22.    December 23, 1979, the VA record noted that Plaintiff tried to go to school but was unable. (Id. at 4283)

23.    On January 28, 1980, there was a request of change of program, University of New Mexico to Albuquerque. (Id. at 4281)

24.    On April 14, 1980, there was a request for change of program from Albuquerque to Highlands University. (Id. at 4275)

25.    May 22, 1980 to June 13, 1980, Plaintiff received psychiatric treatment at the Albuquerque Veterans Administration Hospital. (Trial Ex. 6 at 53)

26.    July 7, 1980, Plaintiff presented at the Albuquerque Veterans Administration Hospital complaining of weakness, dizziness, anxiousness, occasional blurring of vision. (Id. at 109-05)

27.    September 23, 1980, there was a request for change of program, Highlands University to Columbia. (Trial Ex. 2 at 4267)

28.    On November 25, 1980, there was a notation that Plaintiff dropped nine credits from Columbia. (Id. at 4257)

29.    December 1980, Plaintiff received treatment at New York State Psychiatric Institute. (Trial Ex. 16 at 009-13)

30.    March 2, 1981, Plaintiff made an application for benefits for the Veterans Administration for depression since 1977. (Trial Ex. 2 at 2814-17)

31.    April 6, 1981, Plaintiff received treatment at the psychiatric department of Presbyterian Hospital. (Id. at 2810-11)

32.    On July 13, 1981, notation that Plaintiff withdrew from Columbia (Id. at 2802)

33.    July 29, 1981, Plaintiff underwent a psychiatric examination by Frederick J. Curran, MD.   The interval history outlined psychiatric hospitalizations after Plaintiff's release from military service, difficulty in continuing with school, suicide attempts and "…[n]ow comes here because she wants help."  Dr. Curran diagnosed schizophrenia, schizo-affective type, and noted severe incapacity.  Dr. Curran did not review any of the records available.  (Trial Ex. 1 at 01365-66)

34.    The diagnosis of schizophrenia on a patient without first ruling out the possibility of traumatic brain injury is more than even negligence, it is really a level of incompetence, and it stigmatizes patients terribly.  (September 14, 2005, p. 132-33)

35.    The standard of practice for physicians doing disability examinations within the Veterans Administration system is to consider the people they are examining as patients for whom a treatment plan is being formulated in the course of

7

the examination, which includes what condition, what health care, and what social supports the patient will be able to obtain through the Veterans Administration system. It is part of delivering healthcare to veterans, and is not an independent medical examination. (September 14, 2005, pp. 136-37)

36.    The expert for the defendants, Dr. Igor Grant, was also of the opinion that there was nothing in the record or information to suggest a diagnosis of schizophrenia. (September 15, 2005, p. 101) Dr. Grant agreed that the diagnosis of schizophrenia by Dr. Curran was incorrect. (Id. at September 15, 2005, p. 166-67)

37.    February 8, 1982, Plaintiff filed a notice of change of student status, leave of absence for spring term. (Trial Ex. 2 at 4239)

38.    June 2, 1983, a request for change of program, from Columbia to Pace (Id. at 4236)

39.    October 4, 1983, request for change of program, Pace to Columbia. (Id. at 4225)

40.    May 16, 1984, Plaintiff was awarded a master of business administration from Columbia University. (Trial Ex. 12 at 014)

41.    May 1984 to October 1985, Plaintiff worked at Chemical Bank, where a supervisor observed behavioral problems and noted that she did not perform well. (Trial Ex. 2 at 4115-16)

42.     October 24, 1985, Plaintiff was ordered to active duty.  Plaintiff reported for active duty on January 7, 1986. (Id. at 2785)

43.     On the day that Plaintiff was being discharged from active duty, May 30, 1986, she was in an automobile accident in Newport News, Virginia.  (September 13, 2005, p. 107, lines 11-19)

44.     Plaintiff returned to Hawaii, and began to experience pain and discomfort related to the automobile accident and went to Kaahumanu Chiropractic on August 4, 1986, for chiropractic treatment. (Trial Ex. 2 at 2770-73; Id. at 2775-76)

45.     She was treated by Dr. Ward Rider, whose testimony was presented by stipulated affidavit. (December 15, 2005, p. 23, lines 17-19)  Dr. Rider testified that Plaintiff received chiropractic care at Kaahumanu in August and September 1986 for collision-related injuries. (Trial Ex. 9 at 00581; Rider Affidavit)  Dr. Rider also testified that at no time did he ever have an agreement with Ms. Toro to bill for treatment not provided or to document in any way that treatment was provided when it was not. (Rider Affidavit)

46.     At the end of her treatment, Plaintiff was seeing Dr. George Foster, who testified that he examined Plaintiff in October and November 1986, and that he made a diagnosis and prognosis as to Plaintiff's injuries.  Dr. Foster also testified that although he has no independent recollection of Plaintiff specifically, he has never and would never enter into an agreement with a patient to record a visit for treatment when

9

the patient would not show up. Dr. Rider also testified that he would never treat a patient who did not need chiropractic care. (December 15, 2005, p. 13, lines 12-18; Id. at p. 13, lines 19-23; Id. at p. 14, lines 12-15; Id. at pp. 14-15, lines 19-1; Id. at pp. 15-16. lines 24-17; Trial Ex. 2 at 2754; Trial Ex. 9 at 00581)

47.    On November 24, 1986, Plaintiff presented for a Veterans Administration medical exam on the basis of the cervical strain and lumbral-sacral strain resulting from the automobile accident in May. (Trial Ex. 2 at 2753)

48.    On February 20, 1987, Plaintiff discontinued all chiropractic treatment. (Trial Ex. 1 at 02275-77)

49.    On July 24, 1987, Plaintiff received a rating decision finding service connection for neck and back injuries of 10% based on the November 24, 1986 examination. (Trial Ex. 2 at 2743-044)

50.    From July 29, 1987 to August 12, 1987, Plaintiff returned to active duty and during active duty developed acute back pain. (Id. at 2714) An exam on August 10, 1987, by the Army physician found recurrent low back pain and cervical pain, and also found spasms. (Trial Ex. 1 at 02281)

51.    September 11, 1987, after returning from active duty, Plaintiff saw Dr. Kawasaki with complaints of temporal mandibular joint problems. (Trial Ex. 2 at 2730-34)

52.    On September 14, 1987, Plaintiff presented back at the Waipahu Chiropractic Clinic, reporting that following physical training doing sit-ups and runs, she exacerbated her symptoms and she began to undergo further chiropractic treatment for her back pain. (Trial Ex. 1 at 02275-77)   In addition to receiving chiropractic at Waipahu on an as-needed basis between December 1987 and May 1988, (Trial Ex. 2 at 2695), Plaintiff also underwent physical therapy at VA medical facilities in December 1987 (Trial Ex. 1 at 02146), July 1988 (Id. at 02141-2), August 1988 (Id. at 02138), September 1988 (Id. at 02722), and March 1989 (Trial Ex. 2 at 3004).

53.    On July 1, 1989, after a medical examination, Plaintiff was deemed not fit for duty. (Id. at 2628)

54.    On July 19, 1989, a psychological evaluation was done by the VA through a Dr. Tamayo, who stated that the assessment of personality patterns and function did not suggest the presence of a significant psycho-pathological condition. (Id. at 2642-41)

55.    Plaintiff was again reported not fit for duty on October 26, 1989. (Id. at 2627-28)

56.    On November 5, 1990, the Board of Veterans' Appeals found that due to the severity of service-connected disabilities, Plaintiff was no longer able to enjoy or sustain any type of substantial or gainful activity. (Id. at 2615)

11

57.    January 14, 1991, Plaintiff requested reopening of her claim to establish service connection for post traumatic stress disorder ("PTSD") due to a motor vehicle accident. (Id. at 3306)

58.    Between January and March, 1991 Plaintiff presented to the Veterans Center in Honolulu, HI for PTSD testing.  The finding at that time was that Plaintiff did not exhibit nor report the characteristic symptoms that would support a diagnosis of PTSD, but there was a suggestion that there could be head trauma that may account for some of her symptoms. (Id. at 3249; Trial Ex. 19)  March 28, 1991, there was a request to amend medical issue from PTSD to organic mental disorder on the request to reopen claim. (Trial Ex. 2 at 3248)

59.    April 30, 1991, VA psychiatric nurse Thomas and Dr. Sprenger note that if Plaintiff's neck was severely jerked during accident would have resulted in mild head injury which was ignored at the time. (Trial Ex. 1 at 02116)  Also, an EEG showed mildly abnormal due to rear right-central slowing and sharp waves. (Id. at 02156)

60.    May 21, 1991, psychiatric nurse Thomas notes behavioral and organic aspects from post closed head injury which are disabling.  (Id. at 02109)

61.    May 30, 1991, psychiatric doctor Holzgang notes clear neuropsychological deficits consistent with permanent sequelae of head injury. (Id. at 02108; Id. at 02104-01)

12

62.    August 6, 1991, Chief of Psychiatric Service Dr. Gary H. Cohen in doing a compensation and pension exam, notes that Plaintiff has suffered from long-term sequelae of closed-head injury, and currently her I.Q. is 85.   Dr. Cohen utilized Plaintiff's C-file and noted an extensive medical file available to the VA Medical Center in Honolulu.  He identified in the file at that time a letter of recommendation written in August 1977 by Plaintiff's commanding officer, Capt. Hunter. (Id. at 01997-02002)

63.    September 13, 1991, Dr. Holzgang notes that Plaintiff is sad about the loss and changes in her life, especially her ability to work. (Id. at 02670-71)

64.    September 20, 1991, VA Dr. Ross makes a finding of organic personality syndrome and prognosis for returning to previous level of functioning is poor. (Id. at 02665-66)

65.    October 3, 1991, the Social Security Disability examination by Dr. Farkas finds substantial impairments in intellectual capacity, not expected to markedly improve over time, comprehensive testing indicates that she is incapable of employment.

66.    On December 8, 1992, Dr. Holzgang wrote a letter acknowledging that the VA had misdiagnosed Plaintiffs for years. (Trial Ex. 2 at 3391)

67.    Between October 1991 and November 1995, Plaintiff intermittently continued to treat with Dr. Holzgang and Dr. Sprenger.

13

68.    On February 26, 1992, Plaintiff had a diagnostic laparoscopy which found a normal-size uterus and normal ovaries. (Trial Ex. 1 at 02508)

69.    On November 28, 1995, Plaintiff had a laparoscopy which reported post-operative diagnosis of chronic left-pelvic pain and pelvic adhesions. (Trial Ex. 7 at 00196-97)

70.    On January 16, 1996, Plaintiff had moved to Florida and reported to the Florida Veterans Administration Medical Facility with a complaint of recurrent left-lower quadrant pain. It was noted that she had a laparoscopy and all laboratory and x-ray results were normal. (Trial Ex. 2 at 3491)

71.    January 25, 1996, VA Dr. Nisanian examined the Plaintiff and ordered a sonogram. (Trial Ex. 1 at 01196)

72.    Beginning on February 5, 1996, Plaintiff begins treating with VA psychiatrist, Dr. Ramon Boza, who diagnosed organic personality disorder. (Id. at 01480-84)

73.    February 7, 1996, the sonogram of the pelvis and lower abdomen showed normal-size mid-line uterus, normal looking ovaries, probable pelvic adhesions. (Trial Ex. 2 at 3412)

74.    On June 6, 1996, Dr. Nisanian performed a pelvic examination and recommended a total abdominal hysterectomy. (Id. at 3529) At that time, Plaintiff was receiving full psychiatric services at the same Veterans Administration hospital

14

where Dr. Nisanian worked. (Trial Ex. 1 at 01416-17; Id. at 00853; Id. at 00848-49; Id. at 01412; Id. at 01410; Trial Ex. 2 at 3311-32; Id. at 3472; )

75.    On June 13, 1996, Plaintiff signed a Consent to Treatment regarding the total abdominal hysterectomy and bilateral salpingo oophorectomy.  (Trial Ex. 2 at 3392)  Dr. Nisanian testified that he talked about the operation with Plaintiff but that he did not take the consent himself. (September 15, 2005, p. 81, lines 15-25)

76.    On June 18, 1996, a total abdominal hysterectomy was performed at the Miami Veterans Administration Hospital by Dr. M. Broudo and Dr. Morillo.  Dr. Nisanian was the attending physician.  The Operative Report noted that there was a small rent in the bladder.  (Trial Ex. 1 at 01471-70)

77.    June 19, 1996, tissue examination following the total hysterectomy showed no pathological diagnosis.  (Trial Ex. 01468-69)

78.    June 22, 1996, the discharge summary from the hysterectomy operation noted the patient became very anxious and upset and noted further that the patient had a past psychiatric history, and as a result, Psychiatry was contacted to clear her discharge. (Trial Ex. 1 at 01437-40)

79.    On August 23, 1996, Dr. Boza diagnosed organic brain syndrome secondary to head injury.  (Trial Ex. 2 at 3509)

80.    November 11, 1999, Plaintiff had testing done at Straub Hospital in Hawaii noted bladder floor scarring due to bladder injury at the time of the hysterectomy. (Trial Ex. 15 at 203)

81.    March 20, 2000, Plaintiff had the laboratory results from the hysterectomy evaluated by Dr. David Amberger (Trial Ex. 7, at 00198), and through his stipulated testimony, submitted by affidavit (September 14, 2005, pp. 102-103, lines 18-5), he noted that there were no abnormalities identified in Ms. Novak's cervix, endocervix, left and right fallopian tubes, right and left ovaries. (Amberger Affidavit, ¶ 3[sic])

82.    The first to mention the record of an accident in 1977 is Plaintiff's expression of concern about adhesions possibly being caused by an accident in 1977 to a VA physician on June 18, 1997. (Trial Ex. 1 at 01117)

83.    On June 23, 1997, Dr. Boza notes that Plaintiff has difficulties recalling the February 26, 1977 accident. (Id. at 00785)

84.    On August 25, 1997, Dr. Boza indicates he is trying to obtain data of medical history in the C-file. (Id. at 01106)

85.    On September 8, 1997, Dr. Boza's note demonstrates that the Hawaii medical records contain the ER report of February 26, 1977, and also contains descriptions by former military supervisors of Plaintiff as having decisive leadership, professionalism, finest lieutenant, outstanding performance, etc.; however, her next

16

evaluation, done in December 1977, did mention that her performance had declined. At this time, Dr. Boza diagnosed organic affective disorder, chronic, severe, disabling, secondary to her two car accidents in 1977 and 1986. (Id. at 01104-05)

86.    On September 19, 1997, Plaintiff told her VA psychologist that the Veterans Administration has negative meaning to her. (Id. at 01328).

87.    On November 28, 1997, Plaintiff requested to see a psychologist outside and have the Veterans Administration pay for the treatment. (Trial Ex. 11 at 002-3)

88.    December 1997, the Veterans Administration denied Plaintiff's request for outside treatment. (Trial Ex. 2 at 4045)

89.    On December 30, 1997, Dr. Boza notes that the Plaintiff is thinking and rethinking past events (the accidents) that brought about symptomatology. (Trial Ex. 1 at 01312)

90.    On August 26, 1998, Plaintiff requested a diagnosis correction because the Veterans Administration had failed to apply a differential diagnosis prior to diagnosis of schizophrenia-schizoaffective type. (Trial Ex. 2 at 4104-4113)

91.    On March 4, 1999, Dr. Harold Bursztajn diagnoses the Plaintiff with post traumatic stress disorder. (Id. at 4004-10)

92.    March 18, 1999, Dr. Sprenger, in his assessment notes PTSD. (Trial Ex. 1 at 00062)

93.    On September 28, 1999, Dr. Sprenger reports that Plaintiff is awake all night thinking and dreaming about the VA. The PTSD checklist indicated a score of 79, above the cut-off for positive PTSD symptoms, and his assessment was organic brain syndrome and some evidence of PTSD. (Trial Ex. 4 at 20043)

94.    On September 28, 1999, Plaintiff advised physicians at Straub Medical Center that she would not be returning to a psychiatrist at the VA. (Trial Ex. 15 at 213)

95.    From October 22, 1999 to October 26, 1999 the Plaintiff was treated at Queens Hospital and refused transfer to the VA because it was traumatic for her. (Trial Ex. 18 at 150-51)

96.    October 26, 1999, Queens Hospital discharge diagnosis affective disorder and organic personality disorder, history of traumatic brain injury and Axis IV severe with separation from VA. (Id. at 156-57)

97.    July 10, 2000, psychiatrist Dr. Jungfer, history of two head injuries while in the army, and which resulted in significant psychiatric and cognitive impairments, due to delayed diagnosis, she has developed an anxiety disorder that is complicated by depressive episodes. The most appropriate diagnosis is of major depressive disorder with anxiety symptoms secondary to head injury and an organic personality disorder. (Trial Ex. 7 at 00107-09)

98.    On July 30, 2001, Dr. Shephard Ginandes stated that the Veterans Administration made a serious error when diagnosis of schizophrenia-schizoaffective disorder was made. (Trial Ex. 2 at 3837-35)

99.    On April 22, 2002, Dr. Ginandes stated it is my psychiatric opinion that her major depression is related most of all to frontal lobe damage from the head injuries in 1977 and 1986. (Id. at 3742-45)

100.    November 29, 2002, Queens Hospital Emergency Room record, Plaintiff can't go to the VA as multiple stressors culminating in her relationship with the VA and the motor vehicle accidents in 1977 and 1986 which caused brain injury. (Trial Ex. 18 at 55) Admitting diagnosis is PTSD, organic mood disorder from car accidents with head injury, chronic physical limitations and long history of depression. (Id. at 70)

101.    Dr. Bursztajn testified that there was an ongoing failure in the Veterans Administration system to appropriately conduct an evaluation of Plaintiff, to appropriately formulate a differential diagnosis, to appropriately formulate a treatment plan in keeping with her impairments. There was a failure to diagnose, or even to ask the right questions so a diagnosis could be entertained of an organic brain syndrome, which, in fact, she has suffered from. Subsequent to the diagnosis of organic brain syndrome, there was a failure to understand what the consequences of the diagnosis would be once Plaintiff realized that she had suffered somewhere over 15 years of

mistreatment in the Veterans Administration System. There was also a failure to take appropriate steps to prevent the development of neuro-psychiatric impairments in the post-traumatic stress disorder spectrum. There was also a failure to recognize that physical complaints, such as chronic pelvic pain, could well be attributed to her post-traumatic stress disorder spectrum impairments, and as a result, she underwent a hysterectomy that was unnecessary and contra-indicated. (September 14, 2005, pp. 120-21, lines 10-10)

102.  Dr. Bursztajn further testified that Plaintiff's PTSD was a new condition as opposed to the development of a more serious medical problem and that the PTSD is specific to her experiences with the Veterans Administration rather than her experiences in the motor vehicle accident. He also testified that the anxiety, fear, and helplessness, which are symptoms of PTSD, compound the impairments of an organic brain syndrome. (September 14, 2005, p. 171, lines 6-12 and 20-24)

103.  January 8, 2003, treating psychologist Dr. Kathleen Pierce, diagnosis Axis I, major depressive disorder, recurrent, severe, PTSD, chronic with delayed onset, Axis II deferred, Axis III, traumatic brain injury, fibrolmyalgia, irritable bowel and bladder syndrome, chronic back pain, TMJ, acid reflux, Axis IV, problem with primary support, occupational problems, she requested a complete psychological evaluation which would include measures of PTSD, and general assessment of personality psychopathology. Has a history of traumatic brain injury, meets

diagnostic criteria for PTSD, although her symptoms do not appear to be directly related to traumatic event at first glance, thus, Ms. Toro's symptoms represent an atypical manifestation of PTSD, but are likely related to a serious auto accident in 1977, as well as subsequent but less serious accident in 1986. Most troubling traumatic memory was that of reviewing her entire medical chart in 1998, which caused great feelings of helplessness and despair, as she recognized that her cries for medical and mental health attention had not been addressed adequately since her initial accident in 1977. It is likely that viewing her quite extensive medical history served as a trigger, which brought home to her the lost function she has suffered, as well as her poor prognosis for full recovery. (Trial Ex. 205; December 13, 2005, p. 155, lines 14-21; Id. at pp. 158-60, lines 11-8; Id. at p. 161, lines 6-12; Id. at pp. 170-71, lines 19-3; Id. at pp. 176-77, lines 10-1; Id. at pp. 196-97, lines 11-9)

104.    In October, 2003, a publication entitled "The Veterans Health Initiative Traumatic Brain Injury" binder ("The Veterans Health Initiative") was published. (Trial Ex. 33)  This binder provided treatment guidance for physicians.  (Stephens Deposition, p. 26) A goal of The Veterans Health Initiative was to provide primary care providers with information about conditions frequently associated with military service. (Stephens Deposition, pp. 27-28)  The health initiative document is accurate, in terms of the information that is covered, in the treatment of traumatic brain injury. It serves the purpose of trying to provide information and raise the awareness of

21

general practitioners about brain injury. (Stephens Deposition, pp. 33-34)   The publication puts together knowledge about traumatic brain injury which has been passed on by word-of-mouth since the mid-'70s and late '70s into a written form so that it can be more easily taught and transmitted to health professionals. (September 14, 2005, p. 139)

105.   The Veterans Health Initiative, Traumatic Brain Injury binder specifies that a medical assessment in traumatic brain-injured patient should include a thorough history, including accident-related facts, pre-injury information which includes developmental history and educational history, military and legal records, vocational history, psycho-social history, family history, post-injury treatment interventions, and current functional status. (Trial Ex. 33 at p. 63)

106.   Plaintiff's treating psychiatrists in Hawaii, Dr. Morris Sprenger and Dr. Anthony Holzgang did not examine Plaintiff's prior military records, did not review available Veterans Administration medical records and the C-file, did not investigate either the 1977 automobile accident and or the 1986 automobile accident to determine the severity of those accidents, and made no effort to review available records that demonstrated the decline in Plaintiff's performance documented in both the military records and in civilian hospital records. (September 16, 2005, p. 33, lines 14-24; Id. at pp. 38-40, lines 26-17; Id. at p. 40, lines 18-25; December 14, 2005, pp. 177-78, lines 24-3)

22

## B.  OPPOSITION TO CONCLUSIONS OF LAW

Plaintiff incorporates all prior briefings filed with the court before and during trial.

1.     Feres Doctrine.  Although Plaintiff was an active duty officer in the Army at the time of both the February 26, 1977, accident and the March 30, 1986, accident, the medical malpractice events complained of occurred when she was not an active duty member of the armed forces.  Dr. Bursztajn and other physicians who have presented evidence to this court clearly established that, although the brain injury became permanently disabling, other conditions separate and apart from that brain injury would not have occurred had there been timely diagnosis beginning in 1978 when Plaintiff first sought treatment in the VA system after leaving active duty through the time when an ultimate diagnosis was made.  A new injury occurred as a result of this failure to diagnose and treat.  This injury was not incident to service as required by the Feres Doctrine.

2.     Conclusions of Law Regarding schizophrenia diagnosis.  The testimony is uncontroverted that the diagnosis by Dr. Curran in 1981 was wrong and resulted from a breach of the standard of care under all applicable medical malpractice rules.  This was not an independent medical evaluation but was an examination by a Veterans Administration physician of a person who was asking for help.   The suggestion that New York case law applicable to insurance examinations controls this type of examination is incorrect.

23

3.    Medical Negligence Claim – Traumatic Brain Injury.    The court's findings acknowledge a dramatic and relentless decline in Plaintiff's cognitive and physical functioning, and that Plaintiff is unable to care for herself at the current time. This decline may have occurred regardless, but Plaintiff's claim is based upon the VA's long term failure to diagnose, inform and treat the traumatic brain injury after her discharge from the Army in 1977, although provided every opportunity to do so.

Plaintiff's claims also include the misdiagnosis in 1981 and the failure to correctly diagnose the cause of the brain injury in 1991 when it was first determined that there was a brain injury.    The protocol for treatment within the VA requires investigation of records, the records were readily available to any of the physicians at the VA and, in fact, it is obvious from the note from Dr. Cohen in 1991 that he actually was looking at the 1977 records when he prepared that note.

The expert testimony of Dr. Bursztajn was that the brain injury occurred in the 1977 accident and may have been aggravated in the 1986 accident.    The record is replete with entries that Plaintiff exhibited symptoms of traumatic brain injury from 1977 to the present.

This court heard strenuous objection to the testimony of Mary Wilkowski and the issue of that testimony was fully briefed.    Plaintiff's position is still that it was an error to allow Wilkowski to testify, and the error is compounded by the fact that the

24

court found that testimony critical to its decision. The Plaintiff's psychiatric problems in the years following her discharge from active duty were clearly linked to the 1977 accident through the testimony of all medical experts, including all VA doctors except Dr. Grant. Even Dr. Holzgang, although not examining any of the available records prior to 1986, admitted in a letter he wrote for Plaintiff that the VA misdiagnosed Plaintiff for many years.

4.     Medical Negligence Claim—PTSD. The cause of Plaintiff's development of full-blown PTSD was the ultimate realization of the many years that the VA had failed to properly treat her for an injury in the face of an extensive record and her long-term cries for help.

5.     Informed Consent Claims.   Dr. Nisanian did not testify that he was the physician who obtained the Plaintiff's signature on the informed consent form, and Plaintiff testified that she was never informed of the information necessary to make an informed decision on whether or not to have the surgery. Further, it is interesting that although Dr. Nisanian indicated that he did not know about Plaintiff's psychiatric history at the time of discharge, it was noted that psychiatry was consulted at the time of discharge because she had a psychiatric history.

In terms of what the Plaintiff knew or should have known on the issue of informed consent based upon the return of pelvic pain, there were many additional issues on informed consent beyond the elimination of pain. Among other things, there

25

was the matter of potential for the development of cancer and the necessity of drug therapy.

Dr. Nisanian in his examination testified that the standard of care at the time of Plaintiff's surgery required him to explain what the risks were, what the benefits were, and what the alternatives were to the hysterectomy. These included risks from anesthesia, explaining that the operation consisted of removing her uterus, ovary and tubes, and that she could hemorrhage and need a blood transfusion. He stated that the standard required him to tell her that she could have an infection inside her belly, or to the skin, she could have lesions of some close organs during the hysterectomy, such as nicking the bladder or the rectum, and that after the hysterectomy she may not have pelvic pains. He further said that the standard of care required him to discuss that she needed to take hormonal therapy, estrogen replacement therapy, because she would not have ovaries anymore. Further, that she should be told that the hormone replacement was so that she would not develop osteoporosis, would not develop atrophic vaginitis, and that she may, if she did not follow up with mammograms, have breast cancer. That is the risk of taking hormone replacement. (Trial Testimony of Nisanian, Sept. 15, 2005, pp. 61-71)

6.    Unnecessary Surgery and Negligent Performance Claims. The surgery was clearly unnecessary, based upon the pathological findings as reported and

26

confirmed by Dr. Amberger in 2000 at Plaintiff's request. But for the fact that the surgery occurred, there would not have been a rent in the Plaintiff's bladder.

7.    Plaintiff Alejandro Novak's Claim. Because Plaintiff Nidia Novak's claim has merit and should not be dismissed, Plaintiff Alejandro Novak's claim has merit.

DATED: August 8, 2006.

Respectfully submitted,

Joseph Mellon
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

NIDIA L. NOVAK, now know as          )
NIDIA NOVAK, individually and as      )
Next Friend for her minor son,        )
ALEJANDRO G. NOVAK, now know  )   Civil No. CV03-00030 (LEK)
as                                     )
ALEJANDRO NOVAK                       )   **CERTIFICATE OF SERVICE**
                                      )
Plaintiffs,                           )
                                      )
v.                                    )
                                      )
UNITED STATES OF AMERICA,             )
                                      )
Defendant.                            )

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of August, 2006, a true and correct copy of the foregoing PLAINTIFFS' ALTERNATIVE TO THOSE PORTIONS OF THE DEFENDANT'S PROPOSED FINDINGS OF FACT CONCLUSIONS OF LAW TO WHICH PLAINTIFFS OBJECT was filed via Court Link and served upon the following via facsimile:

Thomas A. Helper, Esq.
Assistant U.S. Attorney
PJKK Federal Building
300 Ala Moana Blvd., Ste. 6100
Honolulu, Hawaii 96813
Attorney for Defendant
UNITED STATES OF AMERICA

s; Debbie Griffith

28