IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

NIDIA I. TORO, INDIVIDUALLY    )    CIVIL NO. 03-00030 LEK
AND AS NEXT FRIEND FOR HER     )
MINOR SON, ALEJANDRO G. TORO,  )
                               )
        Plaintiffs,            )
                               )
    vs.                        )
                               )
UNITED STATES OF AMERICA,      )
                               )
        Defendant.             )
_____)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came on before the Court for a bench trial from September 13 to 16, 2005 and from December 13 to 16, 2005. William Copulos, Esq., and Joseph J. Mellon, Esq., appeared on behalf of Plaintiffs Nidia I. Toro, now known as Nidia Novak, individually and as Next Friend for her minor son, Alejandro G. Toro, now known as Alejandro Novak, (collectively "Plaintiffs"). Thomas A. Helper, Assistant United States Attorney, appeared on behalf of Defendant United States of American ("Defendant"). The Court, having considered the pleadings filed herein and the testimony at trial, and having an opportunity to judge the credibility of the witnesses, to examine the exhibits admitted into evidence, and to consider the arguments and representations of counsel, pursuant to Federal Rule of Civil Procedure 52, makes the following Findings of Fact and Conclusions of Law and Order, and FINDS in favor of Defendant. Any finding of fact that should

more properly be deemed a conclusion of law and any conclusion of law that should more properly be deemed a finding of fact shall be so construed.

## BACKGROUND

The facts of this action involve perplexing symptoms, years of medical treatment, and volumes of medical records.  At its essence, this case consists of various allegations of medical negligence under the Federal Tort Claims Act ("FTCA").  Plaintiffs allege that personnel at various Department of Veterans Affairs ("VA") Medical Centers failed to properly diagnose and treat Plaintiff Nidia Toro, now known as Nidia Novak ("Plaintiff Novak") in a timely manner over a period of more than twenty years.  Plaintiffs claim that VA personnel: (1) failed to diagnose and properly treat Plaintiff Novak for organic brain injury as a result of a head injury she sustained in an automobile accident on February 26, 1977, while she was on active duty as an officer in the United States Army ("Army"); (2) improperly diagnosed her with schizophrenia in 1981; (3) failed to diagnose and properly treat her for organic brain injury as a result of injury to her head that she suffered in an automobile accident on May 30, 1986, while she was an officer on active duty in the Army; (4) caused her to suffer post-traumatic stress disorder ("PTSD") when she reviewed her entire VA medical file and consulted with Harold Bursztajn, M.D., and realized that the

VA had mis-diagnosed her organic brain injury for many years; (5) failed to obtain her informed consent for the hysterectomy procedure performed on June 18, 1996 at the VA Medical Center in Miami, Florida; (6) recommended an unnecessary hysterectomy procedure; and (7) performed the hysterectomy in a negligent manner. Plaintiffs allege that Defendant's negligent acts and omissions caused Plaintiff Novak severe and permanent injuries. They also allege that, as a direct result of Defendant's conduct, Plaintiff Alejandro suffered the loss of his mother's companionship and society.

I.    **Introductory Findings and Conclusions**

    A.    **Findings of Fact**

        1.    Plaintiff Novak was commissioned as an Army officer on February 8, 1976. While on active duty, she was injured in an automobile accident on February 26, 1977 ("1977 Accident"). [Trans., Sep. 13, 2005, at 90, lines 8-13.] Plaintiff Novak left active duty on December 10, 1977, but remained an officer in the Army Reserves. [Id. at 91, lines 18-22.]

        2.    From 1980 to 1984, she attended graduate school, eventually obtaining a Master's degree in Business Administration from Columbia University in May 1984. [Tr. Exh. 12 at 014.] She was employed with Chemical Bank in New York City from May 1984 to October 1986. [Tr. Exh. 2 at 4115-16.]

3.    On October 24, 1985, she was ordered to active duty for Reserves' training and she reported for duty on January 7, 1986.  [Id. at 2785.]  On May 30, 1986, Plaintiff Novak was injured in an automobile accident ("1986 Accident"). [Trans., Sep. 13, 2005, at 107, lines 11-19.]  Coincidentally, May 30, 1986 was the last day of her active duty service.  She moved to Hawai`i shortly thereafter.  [Id. at 109, lines 5-10.]

4.    Plaintiff Novak's medical history is substantial. She has received medical care and treatment from numerous VA providers, as well as private providers, in many locations from the 1977 Accident until 1999.  Some of the relevant events involving her medical treatment after the 1977 Accident are:

a.    psychiatric treatment at the El Paso Center for Mental Health and Retardation between January 26, 1979 and February 27, 1979; [Tr. Exh. 13 at 021-27;]

b.    psychiatric treatment at the Albuquerque Veterans Administration Hospital from May 22, 1980 to June 13, 1980; [Tr. Exh. 6 at 53;]

c.    treatment at the New York State Psychiatric Institute in December 1980; [Tr. Exh. 16 at 009-13;] and

d.    treatment at the psychiatric department of Presbyterian Hospital on April 6, 1981.  [Tr. Exh. 2 at 2810-11.]

5.    In 1981, Plaintiff Novak filed a disability benefits claim for depression, which she alleged was connected to her military service.  [Id.]  In connection with her claims evaluation, Frank Curran, M.D., of the VA Clinic in Manhattan, administered a psychiatric exam to Plaintiff Novak on July 29, 1981.  He diagnosed her as suffering from schizophrenia and schizoaffective type.  [Id.]

6.    Following the 1986 Accident, Plaintiff Novak moved to Hawai`i.  She experienced pain and discomfort related to the automobile accident and began chiropractic treatment on August 4, 1986.  [Id. at 2770-73, 2775-76.]  She discontinued chiropractic treatment on February 20, 1987.  [Tr. Exh. 1 at 02275-77.]

7.    In September 1986, Plaintiff Novak filed a claim for VA benefits for back pain.  [Id. at 02758-59.]  On November 24, 1986, she underwent a VA medical exam on the basis of the cervical strain and lumbral-sacral strain resulting from the 1986 Accident.  [Tr. Exh. 2 at 2753.]  On July 24, 1987, she received a rating decision finding a ten-percent service connection for her neck and back injuries based on the November 24, 1986 examination.  [Id. at 2743-044.]

8.    In August 1987, Plaintiff Novak was evaluated for in vitro fertilization by Straub Clinic and Hospital in Honolulu, Hawai`i ("Straub"), and her subsequent pregnancy was confirmed in September 1987.  [Tr. Exh. 15 at 386.]

9.   From July 29, 1987 to August 12, 1987, Plaintiff
Novak served on active duty and, during that time, developed
acute back pain.  [Tr. Exh. 2 at 2714.]  An exam on August 10,
1987, by an Army physician found recurrent low back pain,
cervical pain, and spasms.  [Tr. Exh. 1 at 02281.]

10.   On September 11, 1987, Plaintiff Novak sought
treatment for temporal mandibular joint ("TMJ") problems.  [Tr.
Exh. 2 at 2730-34.]  Plaintiff Novak resumed chiropractic
treatment for her back pain on September 14, 1987, reporting
exacerbation of her symptoms following physical training.  [Tr.
Exh. 1 at 02275-77.]  She received chiropractic treatment on an
as-needed basis between December 1987 and May 1988.  [Tr. Exh. 2
at 2695.]

11.   Plaintiff Novak apparently did not present herself
to the VA for treatment of her injuries from the 1986 Accident
until November 19, 1987 when she first sought treatment for neck,
back, and TMJ pain.  [Tr. Exh. 1 (vol. 1) at 02147-48.]  She
underwent physical therapy at VA medical facilities in December
1987, [Tr. Exh. 1 at 02146,] July 1988, [id. at 02141-2,] August
1988, [id. at 02138,] September 1988, [id. at 02722,] and March
1989, [id. at 3004].

12.   Plaintiff Novak submitted a supplemental VA claim
for her TMJ.  [Tr. Exh. 2 at 2712.]  At the VA compensation
review on April 15, 1988, she complained of neck, shoulder, back

pain, and TMJ syndrome.  [Tr. Exh. 1 at 02020–21.]

13.  On May 19, 1988, Plaintiff Novak gave birth to her son.  [Tr. Exh. 15 at 383.]

14.  Plaintiff Novak was deemed not fit for duty on July 1, 1989, after a medical examination, [Tr. Exh. 1 at 2628,] and again on October 26, 1989.  [Id. at 2627–28.]

15.  On January 6, 1990, Plaintiff Novak filed a claim for increased compensation based on unemployability due to pain in her jaw, shoulder, arm, leg, and back.  [Tr. Exh. 2 at 2643–44.]  On November 5, 1990, the Board of Veterans' Appeals found that, due to the severity of service-connected disabilities, Plaintiff Novak was no longer able to enjoy or sustain any type of substantial or gainful activity.  [Id. at 2615.]

16.  Plaintiff Novak went to the Queen's Medical Center emergency room on February 14, 1990 and reported depression and thoughts of suicide.  [Tr. Exh. 18 at 253.]  On September 24, 1990, she sought treatment at the Miami VA for chronic neck and back pain.  [Tr. Exh. 1 at 01425.]

17.  On January 14, 1991, Plaintiff Novak visited the Vet Center, a VA walk-in facility in Honolulu, and inquired about post-traumatic stress.  [Tr. Exh. 19 at 3.]  She also requested reopening of her claim to establish service connection for post traumatic stress disorder ("PTSD") due to a motor vehicle accident.  [Tr. Exh. 2 at 3306.]

18.   On February 26, 1991, she saw Frederick Tamayo, Ph.D., a neuropsychologist at the VA, for complaints of memory loss and emotional distress associated with the 1986 Accident. Dr. Tamayo assessed her as having cerebral inefficiencies consistent with the residual effects of the accident.  [Id. at 3202-05.]  On April 30, 1991, Plaintiff Novak was seen at the VA facility by nurse practitioner Louise Thomas, who consulted with Maurice Sprenger, M.D.  Dr. Sprenger diagnosed Plaintiff Novak as having suffered a brain injury as a result of the 1986 Accident. [Tr. Exh. 1 at 02116.]  During this time period, the finding was that Plaintiff Novak did not exhibit or report the characteristic symptoms that would support a diagnosis of PTSD, but there was a suggestion that there could be head trauma which may account for some of her symptoms.  [Tr. Exh. 2 at 3249; Tr. Exh. 19.]  On March 28, 1991, there was a request to amend her medical issue from PTSD to organic mental disorder on the request to reopen her claim.  [Tr. Exh. 2 at 3248.]

19.   Between October 1991 and November 1995, Plaintiff Novak intermittently sought treatment with Dr. Sprenger and Anthony Holzgang, M.D., who was the VA's brain specialist and who had expertise in brain injury.

20.   On December 8, 1992, Dr. Holzgang wrote a letter acknowledging that the VA had misdiagnosed Plaintiff Novak for years.  [Id. at 3391.]

8

21.   On November 18, 1995, Plaintiff Novak reported chronic left pelvic pain.  As a result, a diagnostic laparoscopy was performed at Kapi`olani Medical Center in Honolulu, Hawai`i, and several adhesions were removed.  [Tr. Exh. 205 at 36–37.] After moving to Florida, she went to the Miami VA Medical Center's emergency room on January 16, 1996 with complaints of left lower quadrant pain radiating to her left leg.  [Tr. Exh. 1 (vol. 5) at 01198.]  On January 19, 1996, she was seen at the Miami VA's Women's Health Clinic with complaints of abdominal pain.  A pelvic sonogram taken on February 7, 1996 indicated "[p]robable pelvic adhesions".  [Id. at 01042.]

22.   On February 5, 1996, Plaintiff Novak began treatment with a VA psychiatrist, Dr. Ramon Boza, who diagnosed her with organic personality disorder.  [Id. at 01480–84.]  On August 23, 1996, he revised his diagnosis to organic brain syndrome secondary to brain injury.  [Tr. Exh. 2 at 3509.]

23.   On June 6, 1996, Ara Nisanian, M.D., performed a pelvic examination and recommended a total abdominal hysterectomy.  [Id. at 3529.]  On June 13, 1996, Plaintiff Novak signed a Consent to Treatment regarding the total abdominal hysterectomy and bilateral salpingo oophorectomy.  [Id. at 3392.] Dr. Nisanian testified that he talked about the operation with Plaintiff Novak, but that he did not take the consent himself. [Trans., Sept. 15, 2005, at 81, lines 15–25.]

24.  On June 18, 1996, a total abdominal hysterectomy was performed at the Miami VA Hospital by Dr. M. Broudo and Dr. Morillo.  Dr. Nisanian was the attending physician.  The Operative Report noted that there was a small rent in the bladder.  [Tr. Exh. 1 at 01471-70.]  The tissue examination following the hysterectomy showed no pathological diagnosis.  [Id. at 01468-69.]

25.  On November 11, 1999, testing at Straub found bladder floor scarring due to bladder injury at the time of the hysterectomy.  [Tr. Exh. 15 at 203.]

26.  During the period in question, Plaintiff Novak filed several disability claims with the VA.  Among the VA's decisions on her claims are: (1) on July 24, 1987, the VA issued a ten-percent disability rating attributed to cervical strain from the 1986 Accident; [Tr. Exh. 2 at 2736-37;] (2) on May 31, 1988, the VA issued a thirty-percent disability rating from the 1986 Accident; [Tr. Exh. 1 at 02734-35;] (3) on March 8, 1990, the VA issued a sixty-percent disability rating, with forty percent attributed to lumbosacral strain and twenty percent attributed to cervical strain, and denied a claim for unemployability; [Tr. Exh. 2 at 2632-36;] (4) on January 2, 1991, the VA denied her renewed claim for unemployability; [id. at 3307;] (5) on August 26, 1991, the VA issued a total disability rating of eighty percent, taking into account her dementia due to

10

a closed head injury, cervical strain, lumbrosacral strain, and TMJ syndrome from the 1986 Accident; [id. at 3180-82;] (6) on January 27, 1993, the VA issued a one-hundred-percent disability rating due to dementia; [id. at 2945-47].

     27.  On May 9, 1999, Plaintiff Novak filed a Standard Form 95-108 with the VA, which was received on May 10, 1999. [Complaint at ¶ 8.]  Plaintiff Novak filed another Standard Form 95-108 on behalf of her son, which the VA received on January 27, 2000.  The VA failed to make a final disposition of these claims within six months of filing, rendering these claims denied.  See 28 U.S.C. § 2675(a).

     28.  Plaintiffs filed the instant action on May 21, 2002 in the United States District Court for the Southern District of Florida, Miami Division.  The matter was transferred to the District of Hawai`i on January 22, 2003.  Defendant's motion to dismiss was granted in part and denied in part by the district court on September 19, 2003.  The parties filed their written consent to trial by magistrate judge on February 16, 2005.

**B.   Conclusions of Law**

     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1346(b)(1) and 28 U.S.C. § 2671, et seq.  Venue is proper.

11

II.  **Feres Doctrine**

    A.  **Findings of Fact**

       1.  Plaintiff Novak was involved in an automobile accident on February 26, 1977.  At the time, she was an officer in the Army and on active duty.  Plaintiff Novak left active duty on December 10, 1977, but remained an officer in the Army Reserves.  [Tr. Exh. 2 at 2910.]  In January 1986, Plaintiff Novak returned to active duty for Reserves' training.  [Id. at 2747.]  While on active duty, she was involved in an automobile accident on May 30, 1986, which was also her last day of active duty.  Plaintiff Novak apparently remained an officer in the Army Reserves and served another term of active duty from July 29, 1987 to August 12, 1987.  [Tr. Exh. 2 at 2714.]  Plaintiff Novak was ultimately deemed not fit for duty on July 1, 1989 and again on October 26, 1989.  [Tr. Exh. 1 at 2627–28.]

       2.  Harold Bursztajn, M.D., Plaintiffs' expert witness, testified that Defendant failed to timely diagnose Plaintiff Novak's organic brain injury caused by the two automobile accidents.  [Trans., Sept. 14, 2005, at 170, lines 9–22.]  He also testified that, because Defendant failed to provide proper therapy and treatment in a timely manner, Plaintiff Novak's brain injury worsened, resulting in a severe decline in her cognitive and physical functioning, and causing her to suffer trauma sufficient to trigger PTSD when she realized that her

organic brain injury had gone undiagnosed and untreated for many years.  [Id. at 120-21.]

**B.    Conclusions of Law**

1.    In Feres v. United States, the United States Supreme Court held that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service."  340 U.S. 135, 146 (1950).  A serviceman's injury is "incident to service" if it arises "because of his military relationship with the Government[.]"  United States v. Johnson, 481 U.S. 681, 689 (1987).  The rationales behind the Feres doctrine are: 1) the distinctly federal nature of the relationship between the government and members of the armed services; 2) the generous statutory disability and death benefits available to service members, including the Veterans' Benefits Act; and 3) the potentially negative effect such lawsuits would have on military discipline and effectiveness.  See id. at 688-90.  The Feres doctrine does not distinguish between the varying levels of culpability, *i.e.* recklessness, negligence, or intent.  See Broudy v. United States, 661 F.2d 125, 127 n.4 (9th Cir. 1981).  This doctrine applies to both those on active duty in the military and those serving in the military reserves or national guard.  See Jackson v. United States, 110 F.3d 1484, 1489 (9th Cir. 1997) (Feres doctrine barred suit under the FTCA by member

13

of the Naval Reserve); <u>see</u> <u>also</u> <u>Quintana v. United States</u>, 997 F.2d 711, 712 (10th Cir. 1993) (reserve status national guard member barred from bringing FTCA medical malpractice claim).

     2.   The Court concludes that any brain injury Plaintiff Novak sustained in either the 1977 Accident or the 1986 Accident occurred as a result of activity that was incident to her military service.

     3.   Plaintiff Novak claims that Defendant's alleged failure to diagnose and/or to properly treat her organic brain injury in a timely manner impaired her cognitive and physical functioning, and that her impairments worsened over time. Insofar as the Court has concluded that any brain injury Plaintiff Novak sustained in either the 1977 Accident or the 1986 Accident was incident to her military service, Defendant is not liable for such brain injury, in and of itself.

     4.   Further, the <u>Feres</u> doctrine "treats the initial injury and the medical care as two segments of a single episode." <u>Brown v. United States</u>, 151 F.3d 800, 806 (8th Cir. 1998); <u>see also</u> <u>Kendrick v. United States</u>, 877 F.2d 1201, 1203 (4th Cir. 1989) ("It is well established that receipt of medical care in military facilities by members of the military on active duty is 'activity incident to service' and thus a lawsuit against the United States arising from medical treatment of a service member on active duty is barred under <u>Feres</u>." (citations omitted)).

Thus, any aggravation of her brain injury that Plaintiff Novak suffered during her military service as result of the treatment of her injuries from the accidents is also deemed to have arisen out of service-related activity.  The Court therefore concludes that, to the extent that Plaintiffs claim that Defendant is liable for medical negligence for its failure to diagnose and/or treat Plaintiff Novak's organic brain injury from the date of the 1977 Accident to her ultimate discharge from the Army Reserves, this claim is barred by the <u>Feres</u> doctrine because the injuries she suffered were incurred as a result of activities that were incident to her military service.

5.    Once Plaintiff Novak was discharged from the Army Reserves, however, any impairments in her cognitive and physical functioning that occurred as a result of Defendant's alleged failure to diagnose and/or to properly treat her injuries were not incident to her military service.  <u>See</u> <u>United States v. Brown</u>, 348 U.S. 110 (1954) (holding that <u>Feres</u> does not bar a veteran's medical malpractice claim where he was injured seven years after his discharge from the military in a VA hospital while seeking treatment for a service-connected disability).[1]

---

[1] Brown, a discharged veteran, underwent two operations to treat a knee injury he suffered during active duty.  He alleged that during the second operation, the VA used a defective tourniquet that resulted in serious and permanent damage to his leg.  <u>See</u> <u>United States v. Brown</u>, 348 U.S. at 110-11.  The Supreme Court held that Brown's FTCA suit was not barred by the
(continued...)

Thus, Plaintiff Novak's medical malpractice claims for the failure to diagnose and treat her brain injury after her discharge from the Reserves are not barred by the Feres doctrine.

## III. Statute of Limitations

### A.    Findings of Fact and Procedural Background

1.    Plaintiff Novak filed her administrative claims in 1999 and 2000.  Under 28 U.S.C. § 2401(b), claimants are required to submit their administrative claims within two years after the claims accrued.  Defendant argues that Plaintiffs' claims in the instant case are barred by the statute of limitations because Plaintiff Novak did not bring her administrative claims within the two-year period.

2.    A medical malpractice claim brought under the FTCA accrues when the plaintiff discovers, or should have discovered with reasonable diligence, the existence of her injury and its cause.  See United States v. Kubrick, 444 U.S. 111, 119-22 (1979); Davis v. United States, 642 F.2d 328, 331 (9th Cir. 1981)).  Where the plaintiff alleges a failure to properly diagnose or treat, the injury is the development of the problem

---

[1](...continued)
Feres doctrine because Brown's injury occurred after his discharge from military service.  The Supreme Court acknowledged that the surgery took place in a veteran's hospital because of Brown's service and that his injury occurred during service, but stated that this type of claims "is not foreign to the broad pattern of liability which the United States undertook by the Tort Claims Act."  See id. at 112.

into a more serious condition.  See Augustine v. United States,
704 F.2d 1074, 1078 (9th Cir. 1983).

　　　　　3.　　In the present case, Plaintiff Novak alleges that
she developed more serious medical problems because of the VA
doctors' failure to properly diagnose and treat her organic brain
injury.  Her claim accrued when she became aware, or should have
become aware, that her pre-existing condition had developed into
a more serious condition because of the VA doctors' failure to
properly diagnose and treat her.  [Order Granting in Part and
Denying in Part Defendant United States' Motion to Dismiss or in
the Alternative Transfer this Matter to the Southern District of
Florida, filed September 19, 2003, at 10-11.]

　　　　　4.　　In denying the motion to dismiss, the district
court noted that Plaintiff Novak alleges that her mis-diagnosed,
pre-existing condition is the organic brain injury she allegedly
suffered in the 1977 Accident.  Plaintiff Novak alleges that she
did not become aware that her brain was injured in the 1977
Accident until 1999.  The district court stated that these facts,
if true, mean that the limitations period did not start until
1999.  [Id. at 12.]  The district court acknowledged that, by
1992, Plaintiff Novak was aware that she was brain injured and
that she may have suffered an actionable injury as a result of a
mis-diagnosis following the 1986 Accident.  This, however, does
not mean that Plaintiff Novak was aware of her injury in the 1977

17

Accident.  [Id. at 13.]  The district court ruled that Defendant did not establish that Plaintiff Novak had "means of knowing" that her injury derived from the 1977 Accident prior to 1999. Drawing inferences in Plaintiffs' favor, the district court found that Plaintiff Novak "arguably had no reason to know of a pre-existing condition that had worsened in the period after 1977. Therefore, her possible injury in the 1986 accident does not defeat her claims based on the 1977 accident."  [Id. at 15.]

5.    The district court also ruled that Plaintiff Novak's PTSD claim did not accrue until she was diagnosed with PTSD in 1999.  [Id. at 16.]

6.    Diane Polakoff, Psy.D., stated in an August 23, 1996 progress note that Plaintiff Novak talked about an accident that occurred in approximately 1976 and about how it went undiagnosed and untreated until she sustained a second head injury approximately ten years later.  [Stip. Exh. 1 at 01400 (second of two pages numbered 01400).]  Plaintiff Novak testified that this might have been about the time that a spiritualist told her to look for the record about the accident.  [Trans., Sept. 14, 2005, at 10, lines 13-15.]

7.    A week before the date of Dr. Polakoff's note, Plaintiff Novak sent a letter to the VA requesting copies of her medical, psychiatric, hospital stay, laboratory, and other records.  [Tr. Exh. 209.]  Plaintiff Novak testified that this

request was not prompted by a specific cause; she had always
wanted to see her records.

    8.    In a November 22, 1996 progress note, psychologist
Mary Sparks, Ph.D., stated that Plaintiff Novak reported that she
had not had a certain problem prior to her "accidents", [Stip.
Exh. 1 at 01390,] but at trail Plaintiff Novak could not
elaborate on that statement.  On January 24, 1997, Dr. Sparks
noted that Plaintiff Novak "[w]as recently reviewing documents
which reminded her that she has been struggling with depression
for 17 years."  [Id. at 01382.]  Plaintiff Novak could not say
what this referred to.  [Trans., Sept. 14, 2005, at 69-70.]

    9.    In his April 22, 1997 progress note, Dr. Boza
stated that Plaintiff Novak had a "history of head injuries,
twice with episodes of partial amnesia and the like."  [Stip.
Exh. 1 at 01368.]  Plaintiff Novak could not elaborate.

    10.    At trial, Plaintiff Novak testified that she
believes that she received her entire VA claims record, commonly
referred to as the "C file", by June 27, 1997, the date of a
progress note in her medical records which notes that traumatic
brain injury occurred as a result of the two accidents.  [Trans.,
Sept. 14, 2005, at 16, lines 3-10.]  She did, however, also
acknowledge that she testified in her deposition that she had the
"C file" when she had her hysterectomy in 1996.  Plaintiff Novak
testified that files arrived piecemeal and that she didn't

remember when the last file arrived.  Even after she had all her
files, it took her "a couple" or "a few" years for her to
understand it all.  She sought out a forensic psychiatrist to
help her make sense of the files.  [Id. at 21, lines 1-5.]  As a
result, she went to Dr. Bursztajn, who reviewed her records and
issued a report on March 4, 1999.  Plaintiff Novak testified that
she did not understand the implications of the C file until
Dr. Bursztajn explained her brain injury and her PTSD.  [Id. at
25-26.]

   B.   **Conclusions of Law**

        Given the complex nature of Plaintiff Novak's injuries
and the voluminous medical records involved, the Court concludes
that the existence of her injuries and their cause was discovered
by reasonable diligence in 1999 when she reviewed the records in
conjunction with Dr. Bursztajn's report.[2]  Thus, the Court
concludes that Plaintiffs' claims, with the exception of the
claims arising from Plaintiff Novak's hysterectomy which are
analyzed separately below, are not time-barred.

_____

        [2] Based on Plaintiff Novak's testimony, she was clearly
aware of the 1981 schizophrenia diagnosis well before 1997.  It
can be argued, however, that her claim based on that diagnosis is
not time-barred because she could not have realized that the
diagnosis was erroneous until she reviewed her records with Dr.
Bursztajn's report.  For the reasons discussed in section IV.B.,
it is unnecessary to engage in a detailed analysis of whether
Plaintiff Novak's medical malpractice claim arising from the
schizophrenia diagnosis is time-barred.

IV.  **Medical Negligence Claim – Schizophrenia Diagnosis**

A.  **Findings of Fact**

1.    Plaintiffs allege that Dr. Curran committed medical malpractice by erroneously diagnosing Plaintiff Novak with schizophrenia in 1981.  Dr. Curran conducted Plaintiff Novak's psychiatric examination in New York.

2.    Dr. Curran examined Plaintiff Novak in connection with the evaluation of her benefits claim.  His evaluation was made part of her claims file, not her medical file, and Plaintiff Novak's subsequent medical records do not refer to or rely upon Dr. Curran's opinion.

B.  **Conclusions of Law**

1.    Under the FTCA, courts determine the United States' liability for damages based on the law of the state where the tortious act was allegedly committed.  See Hatahley v. United States, 351 U.S. 173, 182 (1956) (citing 28 U.S.C. § 1346(b)(1)).[3]  New York law therefore applies to Plaintiff

_____

[3] Section 1346(b)(1) states, in pertinent part:

> the district courts . . . shall have exclusive
> jurisdiction of civil actions on claims against
> the United States, for money damages, accruing on
> and after January 1, 1945, for injury or loss of
> property, or personal injury or death caused by
> the negligent or wrongful act or omission of any
> employee of the Government while acting within the
> scope of his office or employment, under
> circumstances where the United States, if a
> private person, would be liable to the claimant in
>                                   (continued...)

Novak's claim arising from the schizophrenia diagnosis.

2.    Under New York law, a plaintiff cannot bring a medical malpractice action against a physician who examined her solely for an insurance evaluation because there is no physician-patient relationship under those circumstances.  See Savarese v. Allstate Ins. Co., 731 N.Y.S.2d 226, 227 (App. Div. 2001); LoDico v. Caputi, 517 N.Y.S.2d 640, 642 (App. Div. 1987).

3.    Dr. Curran's examination of Plaintiff Novak was analogous to an insurance evaluation.  Thus, there was no physician-patient relationship between Dr. Curran and Plaintiff Novak.  Plaintiff Novak therefore cannot bring a medical malpractice claim against Dr. Curran for erroneously diagnosing her with schizophrenia.  The Court finds in favor of Defendant with regard to Plaintiffs' claim based on the schizophrenia diagnosis.

---

[3](...continued)
        accordance with the law of the place where the act
        or omission occurred.

28 U.S.C. § 1346(b)(1).  The United States, however, cannot be held liable for prejudgment interest or punitive damages.  See 28 U.S.C. § 2674.

## V.   Medical Negligence Claim – Traumatic Brain Injury[4]

### A.   Findings of Fact

1.   Plaintiff Novak tragically suffered a dramatic and relentless decline in her cognitive and physical functioning.  In the 1970's, she was a very fit, successful, energetic, and much valued Army Officer.  Colonel Melvin Hunter, Plaintiff Novak's former company commander, testified that "she was kind of a star in the area of physical training" and that "[s]he was an exceptional officer.  She stood out amongst the second lieutenants."  [Depo. Testimony of Colonel Melvin Hunter, taken July 18, 2005 at 26:18-23, 41:11-12.]  He stated that he thought she had the potential for a career in the military and that he had no doubt that she would excel in graduate school.  [Id. at 44:1-2, 14-19.]

2.   Currently, Plaintiff Novak is unable to care for herself and depends almost exclusively on her teenaged son to assist her with daily activities such as grocery shopping, meal preparation, and cleaning.  [Trans., Sept. 14, 2005, at 56-57.]

---

[4] Plaintiffs' Complaint also alleges that, because Defendant failed to properly diagnose Plaintiff Novak's brain injury for all those years, it also failed to correctly explain her condition and the available treatments.  Plaintiffs therefore claim that Defendant failed to properly obtain her informed consent to the various treatments Defendant rendered to her throughout the years.  This is essentially a restatement of Plaintiffs' claim that the alleged mis-diagnosis of her condition constituted medical malpractice.  The Court therefore declines to address the mis-diagnosis as a separate informed consent claim.

She testified at length about the tremendous difficulties that she has with a myriad of problems, including chronic pain, panic attacks, and memory loss.  [Id. at 53-56.]

3.  Plaintiff Novak testified that she has refused to receive any medical care or treatment from any VA facilities since 1999.  She had an esophageal attack after talking to a worker at a VA Medical Center, and thereafter would get panic attacks whenever she had contact with any VA facility.  She also had a dispute with Dr. Sprenger concerning her refusal to take anti-psychotic medication.  [Id. at 28-29.]

4.  Plaintiff Novak testified that she had to send her son to the VA pharmacy to pick up her medications because of her fear of the VA.  [Id. at 29, lines 13-18.]  When she had to have contact with the VA, she would have full-fledged panic attacks and anger that would last for weeks.  [Id. at 29-30.]

5.  Four years after her dispute with Dr. Sprenger, she moved to Australia because she feared the VA.  [Id. at 30, line 10.]  She returned to Hawai`i after living in Australia for one year.  [Id. at 30, lines 19-23.]  When she returned, she sought private medical and psychiatric care from Shepard Ginandes, M.D.  [Id. at 31, lines 6-10.]

6.  Gretchen Stephens from the VA helped Plaintiff Novak obtain approval for some of items that her private doctors recommended, and her son would pick up her medications from the

24

VA.  [Id. at 31, lines 1-15.]  Plaintiff Novak could never go to
the VA because of her panic attacks.  [Id. at 31, lines 16-19.]
She subsequently left Hawai`i and, at the time of trial, was
residing in Australia.  [Id. at 31-32.]

  7.  Plaintiff Alejandro Novak's ("Plaintiff
Alejandro") testimony confirms his mother's deterioration.  At
the time of trial, he was seventeen years old and had been caring
for his mother for as long as he could remember.  [Trans.,
Dec. 13, 2005, at 117, lines 5-6.]  He has handled
responsibilities that would entirely overwhelm any grown person,
much less a teenager.  Plaintiff Alejandro testified about
cooking, cleaning, picking up and checking medications, attending
meetings with physicians, and intervening with personal care
attendants on his mother's behalf.  [Id. at 123-25.]  He also
takes care of her service animals, does the shopping, and handles
their monetary budget.

  8.  Because Plaintiff Novak has moved several times to
and from Hawai`i, Australia, Florida, and Puerto Rico over at
least the last ten years, Plaintiff Alejandro's schooling and
friendships have been terribly disrupted.  [Id. at 117-18.]

  9.  Dr. Bursztajn is a psychiatrist.  [Tr. Exh. 35.]
The Court finds that he is qualified to testify as an expert in
psychiatry and brain injury.  [Trans., Sept. 14, 2005, at 115-
17.]  He administered a battery of tests to Plaintiff Novak.

[Id. at 119.]

10.  Dr. Bursztajn testified that Plaintiff Novak
sustained traumatic brain injury from the automobile accidents,
and that she suffers from organic brain syndrome and PTSD.[5]  He
based his conclusions on his review of her medical records, her
performance on the tests that he administered, and his
observations of her.  He also testified that the deterioration in
her cognitive and physical abilities has been caused by
Defendant's failure to: (1) formulate a differential diagnosis;
(2) evaluate her for traumatic brain injury in a timely and
proper manner; and (3) understand the consequences of the
eventual brain injury diagnosis, made after fifteen years of not
treating this injury.  [Id. at 120, lines 10-19.]  He testified
that Defendant's failure to diagnose brain injury from 1987 to
1991 breached the standard of care because Defendant failed to
review Plaintiff Novak's VA medical records as a whole, and to
administer appropriate tests based on her complaints and symptoms
during that time period.  [Id. at 197-98.]

11.  Defendant's expert witness, Igor Grant, M.D., is a
psychiatrist who specializes in neuropsychiatry and
neuropsychology.  [Tr. Exh. 203, 211, 212.]  The Court finds that

---

[5]  Dr. Bursztajn's opinions regarding Plaintiff Novak's
PTSD, as well as his opinions regarding her lack of informed
consent claims, and his testimony on these issues are addressed
in the sections pertaining to those claims.

he is qualified to testify as an expert in psychiatry, neuropsychiatry, and neuropsychology. [Trans., Sept. 15, 2005, at 95-96.]

12. Dr. Grant testified that he could not find evidence of trauma to support a diagnosis of traumatic brain injury. [Id. at 101-02.] He reviewed Plaintiff Novak's medical records, conducted psychological tests on her, and examined her. [Id. at 129.] Dr. Grant testified that Plaintiff Novak is clearly suffering, and has undergone a significant reduction in her social and occupational functioning, and in her activities of everyday life. [Id. at 130, lines 4-7.] He opined that the primary causes of her condition are somatoform disorder and recurrent mood disorder. Dr. Grant testified that the results of the Minnesota Multiphasic Personality Inventory[6] that Plaintiff Novak took in 2003 corroborate his conclusion that there is a strong likelihood that Plaintiff Novak has somataform disorder. [Id. at 141-42.] He also opined that she does not have PTSD. [Id. at 145, lines 1-4.]

13. Dr. Grant testified that Plaintiff Novak's IQ test results between 1989 and 1991 demonstrated a decline from normal range to borderline mental retardation. In 1989, Dr. Tamayo estimated Plaintiff Novak's IQ score to be 104, which is in the

---

[6] The Minnesota Multiphasic Personality Inventory is a standardized personality test.

27

average range.  [Id. at 136, lines 19-24.]  Two years later, her
score was 85, which is in the borderline retarded range.  [Tr.
Exh. 211 at 4.]  However, Dr. Grant also noted that Plaintiff
Novak's IQ was 101 in 1998 and 78 in 1992.  [Trans., Sept. 15,
2005, at 139-40.]

        14.  Mary Wilkowski is an attorney who has a solo law
practice in Hawai`i.  [Trans., Dec. 14, 2005, at 102, lines 1-2.]
She met Plaintiff Novak in 1986 at a club.  [Id. at 102, lines 8-
10.]  Within a week, they had developed a romantic relationship
and Ms. Novak moved into Ms. Wilkowski's residence.  [Id. at 103,
lines 12-15.]  They lived together for about two to three months,
approximately from September to November 1986, until Plaintiff
Novak moved out.  [Id. at 103, lines 16-22.]  They continued to
see one another and would play racquetball together, but they
were no longer lovers.  [Id. at 134-35.]  Their relationship
ended sometime in January 1987 after an argument that they had
after a racquetball game.  [Id. at 110, lines 12-16.]
Ms. Wilkowski admitted that she felt active dislike for Plaintiff
Novak when their relationship ended.  [Id. at 134, lines 11-14.]
Ms. Wilkowski did not see her again until December 20, 1988 when
Ms. Wilkowski was called to testify at a deposition in a Virginia
state lawsuit that Plaintiff Novak filed based on the 1986
Accident.  [Id. at 118, lines 16-21.]

        15.  Ms. Wilkowski testified that Plaintiff Novak told

her that she (Plaintiff Novak) had been in an automobile accident
in Virginia on her last day as an Army officer when another
vehicle tapped the back of the automobile that she was driving.
[Id. at 103-04.]  Ms. Wilkowski testified that Plaintiff Novak
told her in several conversations that she (Plaintiff Novak) was
making a claim for damages, and that she had an arrangement with
the chiropractor who was treating her for injuries sustained in
this automobile accident.  [Id. at 104, lines 6-14.]  Plaintiff
Novak said that the chiropractor would record that he treated
her, regardless of whether or not she showed up for treatment.
[Id. at 104, lines 18-23.]  Ms. Wilkowski testified that
Plaintiff Novak said that this was an opportunity to make money
and that she had filed a lawsuit in Virginia.  [Id. at 106, lines
13-15.]  As a result, Plaintiff Novak and Ms. Wilkowski had
arguments about opportunism and deceit.  [Id. at 106, lines 5-
11.]  When they were living together, Ms. Wilkowski called
Plaintiff Novak's insurer to report Plaintiff Novak for claim
fraud.  [Id. at 120-21.]  Ms. Wilkowski was never contacted by
any insurance commissioner or state agency investigating this
report.  [Id. at 121, lines 7-10.]

        16.  Ms. Wilkowski recalled that Plaintiff Novak played
pool, danced, ran, swam, threw coconuts to her dog, played
racquetball, and made love.  [Id. at 105, lines 6-11.]  She does
not recall how often Plaintiff Novak would jog, swim, or walk,

29

but she recalled that Plaintiff Novak walked more frequently than swam or jogged.  Ms. Wilkowski testified that she played racquetball with Plaintiff Novak at the Honolulu Club.  [Id. at 130, lines 16-19.]  She never observed Plaintiff Novak to be injured nor did Plaintiff Novak claim to be injured.  [Id. at 105, lines 12-17.]  There were no complaints of neck, jaw, or shoulder pains, or any sort of pain at all.  [Id. at 105-06.]

17.  According to Ms. Wilkowski, Plaintiff Novak only had a problem with her memory when she was drinking.  [Id. at 108.]  Ms. Wilkowski recalled seeing Plaintiff Novak once or twice having twelve to fourteen drinks in one night.  [Id. at 133, lines 8-12.]  Ms. Wilkowski testified that Plaintiff Novak went out three to four times a week, and that alcohol would reek from Plaintiff Novak's pores in the mornings after she went out.  [Id. at 133, lines 16-21.]  Other than at those times, Plaintiff Novak made no complaints about being forgetful or having problems understanding other people.  [Id. at 108-09.]  Ms. Wilkowski never had a problem understanding Plaintiff Novak.  [Id. at 109, lines 5-8.]

18.  Dr. George Foster is a retired chiropractor who currently resides in Kansas.  [Trans., Dec. 15, 2005, at 7, lines 8-12.]  He testified that he does not recall Plaintiff Novak but he looked at his records for Nidia Toro.  [Tr. Exh. 216.]  These records are the narratives that he used in his practice.

[Trans., Dec. 15, 2005, at 13–14.]  He has never had a complaint
filed against him as a chiropractor nor has he been sued.  [Id.
at 9.]

19.  On February 26, 1991, Plaintiff Novak saw Dr.
Tamayo for complaints of memory loss and emotional distress
associated with the 1986 Accident.  He assessed her as having
cerebral inefficiencies consistent with the residual effects of
the accident.  [Tr. Exh. 2 at 3202–05.]

20.  Dr. Sprenger, testified that he is currently
employed at the VA Center in Atlanta, Georgia.  [Trans., Dec. 14,
2005, at 141–42.]  He was previously employed at the VA Center in
Hawai`i from 1988 to 2000.  Dr. Sprenger testified that he first
saw Plaintiff Novak on April 30, 1991 at Louise Thomas' request.
[Id. at 144, lines 2–9.]  He understood Plaintiff Novak's
complaints to be that she had memory problems, concentration
difficulties, and some irritability, and that Plaintiff Novak
attributed these problems to a motor vehicle accident.  [Id. at
146, lines 5–13.]  Because she also complained of symptoms that
might have been seizures, he prescribed medication.  [Id. at 146,
lines 14–18.]  He ordered an EEG and CT scan because he was
concerned that Plaintiff Novak was having memory difficulties at
her age and he thought that a brain tumor or other disease should
be ruled out.  [Id. at 146–47.]  His provisional diagnosis was
"closed head injury".  The EEG showed slowing in some areas and

the CT was not abnormal.  [Id. at 151, lines 2-7.]  He thought
Plaintiff Novak had some symptoms of post-concussion syndrome and
assumed it was because of the 1986 Accident because of her
history.  She did not recall clearly what happened in this
accident.  [Id. at 176-77.]

21.  Dr. Sprenger testified that he continued to see
Plaintiff Novak until September 1991.  [Id. at 151, lines 22-24.]
After consulting with Dr. Holzgang, Dr. Sprenger transferred
Plaintiff Novak to Dr. Holzgang's care at Tripler Army Hospital.
[Id. at 151-52.]

22.  On November 10, 1994, Dr. Holzgang transferred
Plaintiff Novak's care back to Dr. Sprenger because Dr. Holzgang
was moving to Michigan.  [Id. at 153-54.]  They discussed
Plaintiff Novak's condition and agreed that the head injury was
the problem and that her continued dementia was permanent.  [Id.
at 154, lines 10-22.]  By July 29, 1995, Dr. Sprenger's
assessment was "closed head injury – severe".  Dr. Sprenger saw
Plaintiff Novak on November 11 and 30, 1995, and then did not see
her again until March 18, 1999.  At that time, she told him that
she was moving to Mau`i.  [Id. at 161, lines 15-19.]

23.  He saw her next on June 30, 1999 and she told him
that she had moved back from Mau`i.  [Id. at 162, lines 8-17.]
By that point, he had worked with her off and on for years and
was seeing a pervasive pattern beyond the organic brain disorder.

[Id. at 163, line 12-16.]  In particular, she would attach herself to one person, but, if they said anything that she did not like, then she would vilify them.  [Id. at 163, lines 17-21.] She was impulsive in moving to different places, and had difficulty maintaining relationships.  [Id. at 163, lines 22-24.] Her moods changed very rapidly.  [Id. at 164, lines 3-9.]

24.  Plaintiff Novak's last visit with Dr. Sprenger was on September 28, 1999.  [Id. at 164, lines 10-15.]  According to Dr. Sprenger, she had reviewed some of her experiences in Miami and had become more agitated.  [Id. at 164, lines 20-22.]  She was angry about the VA losing her records and it seemed that the VA was becoming the bad person in her life.  [Id. at 164-65.] Plaintiff Novak demanded to be tested for PTSD.  [Id. at 165, lines 3-4.]  She seemed relieved and pleased about the diagnosis of brain trauma because she had something that could explain her symptoms.  [Id. at 167, lines 17-20.]

25.  She told him that the VA was going to pay for what they were doing to her, that she was going to seek private care, and that the VA was going to pay for it.  [Id. at 168, lines 5-10.]  He disagreed with her and told her that the VA could pay for outside treatment on a fee basis, but it would not happen just because she wanted it.  [Id. at 168, lines 11-14.]

26.  During the time that Dr. Sprenger saw Plaintiff Novak, he never saw her being scared of the VA.  [Id. at 170,

lines 3-5.]  He found that she never had problems coming in and asking for what she wanted, but she was not forthcoming when he would request information.  [<u>Id.</u> at 170, lines 5-16.]  For example, she would refuse to discuss childhood trauma history with him.  [<u>Id.</u> at 170, lines 17-20.]  When asked about her medical history, she repeatedly told him that she had no hospitalizations, no psychiatric history, and no suicide attempts.  [<u>Id.</u> at 170-71.]

B.  **Conclusions of Law**

1.  **Applicable Law.**

In negligence actions brought under the FTCA, the United States is liable only where a private person would be liable for the same act or omission under the laws of the state within which the act or omission occurred.  <u>See</u> 28 U.S.C. §§ 1346(b)(1), 2674.  Plaintiff Novak's medical malpractice claim is based upon the VA's failure to diagnose and treat her traumatic brain injury as caused by the 1977 Accident and the 1986 Accident.  Her remaining claim is based on medical care and treatment she received from VA medical providers in Hawai`i and Florida after she was medically discharged from the Army Reserves sometime in 1989.

a.  **Hawai`i law**

Under Hawai`i law, a plaintiff in a medical malpractice case must establish that: the defendant owed a duty to the

34

plaintiff; the defendant breached that duty; and there is a causal relationship between the defendant's breach and the plaintiff's injury. See Bernard v. Char, 79 Hawai`i 371, 377, 903 P.2d 676, 682 (Ct. App. 1995). Hawai`i courts generally require expert medical testimony to establish negligent treatment because "'lay jurors are ill prepared to evaluate complicated technical data for the purpose of determining whether professional conduct conformed to a reasonable standard of care and whether there is a causal relationship between the violation of a duty and an injury to the patient.'" Id. (quoting 4 F. Lane, Lane Medical Litigation Guide § 40.14, at 54 (1993)) (some citations omitted). Further, the expert cannot merely testify that he would have treated the patient in a particular manner; the expert must testify "that the defendant's treatment deviated from any of the methods of treatment approved by the standards of the profession." Id. (citing 3 F. Harper, F. James, Jr. & O. Gray, The Law of Torts § 17.1, at 554–44 (2d ed. 1986)).

### b. Florida law

Similarly, a plaintiff in a medical malpractice action under Florida law must establish: the standard of care owed by the physician; that the physician breached his duty to provide care in accordance with that standard; and that the breach was the proximate cause of the plaintiff's injury. See Torres v. Sullivan, 903 So.2d 1064, 1067 (Fla. Dist. Ct. App. 2005). "The

35

prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." Fla. Stat. § 766.102(1).

The standard of care in a particular medical field under a given set of circumstances is not within a layman's expertise or comprehension. Florida courts have therefore held that expert testimony is necessary to establish the standard of care in a particular medical field. See Torres, 903 So.2d at 1067–68. Under Florida law, the expert witness need not practice in the same specialty area as the physician accused of malpractice. See Loadholtz v. Andrews, 855 So.2d 1241, 1243 (Fla. Dist. Ct. App. 2003). Florida Statutes § 766.102(2)(c) (1996)[7] provides:

> The purpose of this subsection is to establish a
> relative standard of care for various categories
> and classifications of health care providers. Any
> health care provider may testify as an expert in
> any action if he or she:
>     1.   Is a similar health care provider
>     pursuant to paragraph (a) or paragraph (b);

---

[7] The comparable provision in the current version of the statute is § 766.102(5). Amendments to § 766.102(2)(c) took effect on September 15, 2003. The Florida legislature intended that the amendments would apply to prior medical incidents, but only where the notice of intent to initiate litigation was mailed on or after the amendments' effective date. See Loadholtz, 855 So.2d at 1243 n.2 (citing Ch. 2003–416, §§ 48, 86, Laws of Fla.). In the instant case, Plaintiffs initiated the litigation well before September 15, 2003.

> or
> 2.   Is not a similar health care provider
> pursuant to paragraph (a) or paragraph (b)
> but, to the satisfaction of the court,
> possesses sufficient training, experience,
> and knowledge as a result of practice or
> teaching in the specialty of the defendant or
> practice or teaching in a related field of
> medicine, so as to be able to provide such
> expert testimony as to the prevailing
> professional standard of care in a given
> field of medicine.  Such training,
> experience, or knowledge must be as a result
> of the active involvement in the practice or
> teaching of medicine within the 5-year period
> before the incident giving rise to the claim.

Fla. Stat. § 766.102(2)(c) (1996).

## 2.   **Breach of Standard of Care and Causation**

The key factual issue at the heart of most medical malpractice claims is: what caused the plaintiff's injury?  At its core, this case is no different, but it is perhaps one of the most bewildering.  Plaintiff Novak's symptoms, physical and psychological test results, and medical history are confounding and often contradictory.  In the end, the Court is constrained to hold Plaintiffs to their burden, both under Hawai`i and Florida law, to prove the elements of breach of the standard of care, and causation.  This Court concludes that Plaintiffs have not established by a preponderance of the evidence that Plaintiff Novak exhibited symptoms of traumatic brain injury after the 1986 Accident and before seeing Drs. Tamayo and Sprenger in 1991.  Insofar as Plaintiffs cannot demonstrate that Plaintiff Novak exhibited symptoms of a traumatic brain injury in the period

immediately following the 1986 Accident, they cannot prove that Defendant breached any standard of care by failing to make that diagnosis prior to 1991. Nor have Plaintiffs proven that Plaintiff Novak's current condition is caused by Defendant's failure to diagnose and treat her traumatic brain injury in a timely manner.

### a. __Testimonies of Drs. Sprenger and Bursztajn__

Dr. Sprenger testified that typically the first year is the critical time for providing intensive therapy to brain injured patients and, after that time, there are minimal gains. [Trans., Dec. 14, 2005, at 156, lines 5–14.] Dr. Bursztajn testified that failure to recall an automobile accident is an indication of potential traumatic brain injury, that complaints of fatigue and dizziness are classic symptoms of mild traumatic brain injury, and that people with traumatic brain injury are particularly vulnerable to anxiety, fear, and horror. [Id. at 127, lines 15–25.]

### b. __Testimony of Ms. Wilkowski__

Ms. Wilkowski testified that, in the year following the 1986 Accident, Plaintiff Novak did recall this accident, was physically and socially active, and did not have any memory problems or difficulties in being understood or understanding others. While Ms. Wilkowski admittedly had strong negative emotions about Plaintiff Novak when they ended their

relationship, their disagreeable situation happened eighteen years before Ms. Wilkowski testified at trial.  It is difficult to conclude that this witness would hold a grudge for eighteen years against someone with whom she had a romantic relationship that lasted less than four months, and who she only knew for about a year.  Rather, this Court finds Ms. Wilkowski's testimony to be credible and detailed.  Her recollections of Plaintiff Novak during the months following the 1986 Accident are critical and support the Court's finding that Plaintiff Novak did not exhibit symptoms or problems that could be reasonably associated with traumatic brain injury.

### c.  <u>Treatment of Her Injuries</u>

Additionally, Plaintiff Novak's medical records in the four-year period following the 1986 Accident are instructive. Plaintiff Novak did not seek treatment for her injuries until she saw a chiropractor on August 4, 1986, over two months after the accident.  [Tr. Exh. 1 (vol. 1) at 02272.]  She apparently did not present herself to the VA for treatment of her injuries until November 1986 when she first sought an examination for pains associated with 1986 Accident.  [Tr. Exh. 2 at 2753.]  From May 30, 1986 to February 14, 1990 (when she went to the emergency room at Queen's Medical Center with reports of depression and thoughts of suicide, [Tr. Exh. 18, 253,]), Plaintiff Novak did not appear to have the symptoms or complaints that the expert

witnesses testified are associated with traumatic brain injury. While Plaintiff Novak reported physical problems to the VA, she either failed to report, or outright denied, these complaints to her Straub physicians during the same time period.

### d.    Investigation of her Medical History

Further, there is nothing in the record to support Plaintiffs' claim that, once the VA diagnosed Plaintiff Novak with a brain injury as a result of the 1986 Accident, it committed medical malpractice by failing to investigate her medical history and determine that the 1977 Accident was the original cause of her brain injury.  In the years between the 1977 Accident and the 1986 Accident, Plaintiff Novak remained a high achiever, completing a master's degree and becoming a major in the Army.  While Plaintiff Novak had psychological problems in the years following her discharge from active duty, these were not clearly linked to the 1977 Accident.

### e.    Conclusion

The Court concludes that Plaintiffs failed to establish that Plaintiff Novak exhibited signs or symptoms of traumatic brain injury prior to 1991 that should have alerted the VA to a possible diagnosis of traumatic brain injury.  Thus, Plaintiffs have failed to prove that Defendant breached the standard of care by failing to diagnose her brain injury prior to 1991. Plaintiffs have also failed to establish that the 1991 diagnosis

40

should have prompted Defendant to investigate whether Plaintiff
Novak suffered traumatic brain injury as a result of the 1977
Accident.  It stands to reason then that, because Plaintiffs
cannot prove that Defendant breached any standard of care by
failing to make such diagnoses, they cannot prove that
Defendant's breach caused Plaintiff Novak's injuries.  The Court
therefore finds for Defendant on Plaintiffs' medial negligence
claim based on traumatic brain injury.

## VI.  **Medical Negligence Claim – PTSD**

### A.  **Findings of Fact**

1.  Dr. Bursztajn testified that Plaintiff Novak had a
subclinical form of PTSD in 1991.  [Trans. Sept. 14, 2005, at
168, lines 24–25.]  By 1999, she received all of her medical
records and had his report analyzing her records.  At that point,
her PTSD became a full-blown condition, which was triggered when
she realized that she had been mis-diagnosed for many years and
that she had lost fifteen to twenty years of her life because of
the mis-diagnosis.  Dr. Bursztajn testified that, in his opinion,
Plaintiff Novak's condition will only improve if she receives
care outside of the VA system.  [Id. at 175, lines 10–15.]  He
further opined that, if she remains under the VA's care and
control, it is foreseeable that she will continue to deteriorate
and have to be prematurely institutionalized when her son leaves
her home.  [Id. at 176–77.]

41

2.   Dr. Grant testified that Plaintiff Novak does not suffer from PTSD because she does not meet the diagnostic criteria.  In his view, there is no extraordinary event or trauma that served as a trigger and therefore the diagnosis cannot be supported.  [Trans., Sept. 15, 2005, at 119, lines 7-24.]

3.   Dr. Sprenger testified that he included PTSD in his assessment for the first time following his March 18, 1999 telephone consultation with Plaintiff Novak, who had called him from Florida.  He does not, however, know why he included PTSD in his assessment.  [Trans., Dec. 14, 2005, at 204-05.]  In September 1999, at Plaintiff Novak's insistence, he administered the PTSD checklist and she scored seventy-nine on this test. [Id. at 165, lines 3-11.]  He considered this score to be marginal because any score over seventy-five is considered to be indicative of PTSD.  [Id. at 165, lines 3-13.]

**B.   Conclusions of Law**

As the Court has concluded that Plaintiffs have not demonstrated that Defendant breached the standard of care by failing to make a timely diagnosis of traumatic brain injury, it likewise follows that this Court must find that Plaintiffs have not proven that Defendant's failure to timely diagnose Plaintiff Novak's traumatic brain injury caused her to develop full-blown PTSD.  The Court therefore finds in favor of Defendant on the medical negligence claim for PTSD.

42

## VII. <u>Informed Consent Claim</u>

### A. <u>Findings of Fact</u>

1. On June 18, 1996, Plaintiff Novak underwent a hysterectomy procedure at the VA Medical Center in Miami, Florida. Plaintiff Novak testified that she was not advised of the risks involved. In particular, she claims that she was not told that she could still have pelvic adhesions after the surgery, which could cause her pain symptoms to return. Plaintiff Novak testified that, if she had been given all of the information about the associated risks, she would not have submitted to the procedure. [Trans., Sept. 13, 2005, at 205-09.]

2. Joy Dy Buco, a nurse practitioner and the coordinator for the Women's Wellness Center and for the Gynecology Clinic for the VA Medical Center in Miami, Florida, testified that she examined Plaintiff Novak on March 29, 1996 and scheduled her for a follow-up with Dr. Nisanian. [Trans., Sept. 15, 2005, at 17, lines 8-15.] Subsequently, Dr. Nisanian suggested a hysterectomy and removal of the fallopian tubes. [<u>Id.</u> at 22, lines 15-20.] Ms. Dy Buco testified that she had heard Dr. Nisanian speak to patients more than fifty times about the risks associated with a hysterectomy procedure, [<u>id.</u> at 23, lines 14-17,] and that he told Plaintiff Novak about the risks of the hysterectomy, including that she may need hormone replacement therapy and that she may have scar tissue. [<u>Id.</u> at 23-25.]

43

Ms. Dy Buco also testified that she was not aware that Plaintiff Novak was being seen as a patient at the Mental Health Clinic of the VA Medical Center.  [Id. at 29, lines 8-11.]

     3.   Dr. Nisanian testified hat he told Plaintiff Novak about the risks of the surgical procedure and the anesthesia and that she would have to take hormone replacement therapy because her ovaries would be removed.  He admitted that he did not have an independent recollection of telling Plaintiff Novak these things, but stated that he must have done so because he has performed thousands of hysterectomies and that it was his standard practice to explain the procedure's risks and consequences to the patients.  [Id. at 61-64.]  Dr. Nisanian also testified that he did not know about Plaintiff Novak's psychiatric history.  [Id. at 76-77.]

     4.   Dr. Bursztajn testified that, at the time of the procedure, Plaintiff Novak was under the care of a psychiatrist. In his opinion, the applicable standard of care required the surgical staff to obtain a psychiatric consult before performing the hysterectomy on Plaintiff Novak.  Further, if the psychiatrist learned about the pending procedure, the applicable standard of care required the psychiatrist to get Plaintiff Novak's permission to consult with the gynecologist about her ability to give informed consent.  [Trans., Sept. 14, 2005, at 144-45.]

**B.     Conclusions of Law**

**1.     Statute of Limitations**

a.     Plaintiff Novak filed her administrative claims on May 9, 1999 and in 2000.  Under 28 U.S.C. § 2401(b), she was required to submit her administrative claims within two years after the claims accrued.  For Plaintiff Novak's claim alleging lack of informed consent to the hysterectomy procedure performed on June 18, 1996, the statute of limitations commenced when (1) the injury manifested itself, and (2) the facts about the injury's cause became available to the plaintiff.  See United States v. Kubrick, 444 U.S. 111, 122 (1979); see also Augustine v. United States, 704 F.2d 1074, 1078 (9th Cir. 1983) (holding that a claim accrues when "'the plaintiff has discovered, or in the exercise of reasonable diligence, should have discovered, both his injury and its cause.'" (quoting Davis v. United States, 642 F.2d 328, 331 (9th Cir. 1981))).

b.     Plaintiff Novak claims that she was not informed of the risk that the hysterectomy might not eliminate her pelvic pain and that, if she had known of this risk, she would not have undergone the procedure.  On January 28, 1997, Plaintiff Novak complained that her pelvic and abdominal pains had returned.  [Tr. Exh. 1 at 01381.]  Plaintiff Novak was seen for pelvic pain on April 24, 1997, and the physician noted that she may have "pelvic pain syndrome".  [Id. (vol. 4) at 01366.]

45

Plaintiff Novak knew or should have known by April 24, 1997 that the hysterectomy did not eliminate her pelvic pain and she therefore knew or should have known about her claim for lack of informed consent.  Plaintiff Novak failed to bring her administrative claim with in two years of that date.  Accordingly, the Court finds that Plaintiff Novak's claim for lack of informed consent is time-barred.

2.   For the sake of completeness, this Court examines Plaintiff Novak's claim for lack of informed consent to the hysterectomy procedure.  The Court finds that, even if Plaintiff Novak's claim for lack of informed consent is not time-barred, this claim fails.

3.   In light of 28 U.S.C. § 1346(b)(1), the Court finds that Florida law must be applied as to Plaintiff Novak's claim for lack of informed consent.

4.   Florida courts recognize lack of informed consent as a separate theory of liability from the negligent performance of a surgical procedure.  See Chua v. Hilbert, 846 So.2d 1179, 1182 (Fla. Dist. Ct. App. 2003).  At the time of Plaintiff Novak's hysterectomy, Florida's informed consent statute provided, in pertinent part:

> (3) No recovery shall be allowed in any court in this state against any physician licensed under chapter 458 . . . in an action brought for treating, examining, or operating on a patient without his informed consent when:
> (a)  1. The action of the physician . . . in

46

obtaining the consent of the patient or another
person authorized to give consent for the patient
was in accordance with an accepted standard of
medical practice among members of the medical
profession with similar training and experience in
the same or similar medical community; and
     2. A reasonable individual, from the
information provided by the physician . . . under
the circumstances, would have a general
understanding of the procedure, the medically
acceptable alternative procedures or treatments,
and the substantial risks and hazards inherent in
the proposed treatment or procedures, which are
recognized among other physicians . . . in the
same or similar community who perform similar
treatments or procedures; or
    (b) The patient would reasonably, under all
the surrounding circumstances, have undergone such
treatment or procedure had he been advised by the
physician . . . in accordance with the provisions
of paragraph (a).

Fla. Stat. § 766.103 (1996).

    5.   In <u>Gouveia v. Phillips</u>, the Fourth District Court
of Appeals held that expert testimony is necessary for the trier
of fact to determine whether the physician's medical disclosure
was incorrect or incomplete in some way.  <u>See</u> 823 So.2d 215, 228
(Fla. Dist. Ct. App. 2002).  The court noted that "[o]nly
practitioners with knowledge about the medical subject involved
are competent to prescribe what information must be imparted. . .
. [T]he trier of fact will have to know what would be accurate or
adequate according to that physician's 'community' or specialty."
<u>Id.</u>

    6.   Dr. Bursztajn testified that, because Plaintiff
Novak was under psychiatric and psychological care at the VA

47

Medical Center, the surgical staff had a duty to seek a
psychiatric consult before performing the hysterectomy on
Plaintiff Novak to determine whether she had the capacity to
consent to the surgery and to rule out the possibility of PTSD.
Based on Dr. Bursztajn's testimony, Plaintiffs argue that the
VA's breach of this duty rendered the attempt to obtain Plaintiff
Novak's informed consent incomplete or incorrect.

Dr. Bursztajn's is qualified as an expert witness in psychiatry.[8]
However, he does not have the knowledge and expertise sufficient
to qualify him as an expert in the field of gynecology or
surgery.  See Living Designs, Inc. v. E.I. DuPont de Nemours, 431
F.3d 353, 368 n.14 (9th Cir. 2005) (noting that, when determining
the reliability of proposed expert testimony concerning non-
scientific issues, courts must rely heavily on the expert's
knowledge and expertise rather than on the factors identified in
Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579
(1993)).  This Court therefore finds that Dr. Bursztajn's
testimony regarding the surgical staff's duty to obtain a
psychiatric consult is not credible.

        7.   Plaintiff Novak did not provide any other
testimony in support of her argument that the surgical staff was
required to seek a psychiatric consult in order to obtain her

---

        [8] Dr. Bursztajn's opinions regarding the duties that
Plaintiff Novak's mental health providers owed her concerning her
ability to consent to the hysterectomy are discussed below.

informed consent to the hysterectomy.  This Court therefore finds that Plaintiff Novak failed to provide the required expert testimony necessary to prove that the medical disclosure was incorrect or incomplete because the surgical staff failed to obtain a psychiatric consult.

8.    Plaintiff Novak testified that she was not adequately informed of the surgical risks, including that a hysterectomy was likely to cause surgical adhesions and reoccurrence of the pelvic pain.  Where the issue is merely a dispute over whether the physician actually disclosed what he claims to have disclosed, no expert testimony is required.  Such a decision is an ordinary credibility determination that is within the trier of fact's capabilities.  See Gouveia, 823 So.2d at 228.

9.    Under § 766.103, a written consent that meets the requirements of subsection (3), and was validly signed by the plaintiff or another authorized person, creates a rebuttable presumption of valid consent.  See Fla. Stat. § 766.103(4)(a). "A valid signature is one which is given by a person who under all the surrounding circumstances is mentally and physically competent to give consent."  § 766.103(4)(b).

10.  Plaintiff Novak signed an informed consent form for the hysterectomy surgery on June 13, 1996.  [Tr. Exh. 1 (vol. 8) at 01404.]  The form asks the patient to certify that: "The

49

nature of the proposed operation or procedure, possible alternative methods of treatment, the risks involved, and the possibility of complications have been fully explained to me. I acknowledge that no guarantees have been made to me concerning the results of the operation or procedure." [Id.] This Court finds that the written consent form that Plaintiff Novak executed meets the requirements of § 766.103(3). Thus, if Plaintiff Novak's signature on the form is valid, it creates a rebuttable presumption that she gave her informed consent.

11. Plaintiffs contend that Plaintiff Novak was not mentally and physically competent to give her informed consent to the hysterectomy. The mere fact that Plaintiff Novak was under psychiatric or psychological care during that time does not prove that she was not competent to give her informed consent. Both Dr. Nisanian and Ms. Dy Buco testified that they were not aware that Plaintiff Novak was a patient at the Mental Health Clinic. Further, there is no indication in the medical records that Plaintiff Novak told them about any psychiatric history or complaints, or that she exhibited any signs that she was mentally incompetent to give informed consent to the hysterectomy.

12. Dr. Bursztajn testified that Plaintiff Novak's psychiatrist had a duty to ask her permission to speak with her gynecologist about her ability to give informed consent before the hysterectomy. [Trans., Sept. 14, 2005, at 145, lines 2–12.]

50

Plaintiff Novak had a therapy session with Dr. Sparks, a psychologist, on June 10, 1996. Dr. Sparks noted that Plaintiff Novak anticipated that her anxiety level would increase after her surgery. Dr. Sparks noted that they discussed how Plaintiff Novak could minimize such anxiety, but there is nothing in Dr. Sparks' note which indicates that Plaintiff Novak may have been mentally incapable of giving informed consent. [Tr. Exh. 1 at 01410.] The treatment notes of the VA mental health providers who treated Plaintiff Novak in the months preceding the hysterectomy indicate that she experienced depression, anxiety, and difficulty managing her emotions. She admitted having occasional suicidal thoughts, but said that she would never act on them. The Court finds that there is nothing in the medical record which indicates that her condition was so severe that she was not competent to make medical or treatment decisions for herself.

13. The Court further finds that there was no basis for Plaintiff Novak's psychologists and psychiatrists to believe that she was incapable of giving informed consent to a medical procedure. The Court therefore rejects Dr. Bursztajn's testimony that Plaintiff Novak's psychologists and psychiatrists had a duty to consult with her gynecologist about her alleged inability to give informed consent.

14. Based on the record and the testimony of the

witnesses, the Court finds that Plaintiff Novak was mentally and physically competent to give informed consent.[9] Her informed consent form therefore creates a rebuttable presumption that she gave her informed consent to the hysterectomy procedure.

15. The Court also finds that Plaintiff Novak's testimony that the VA staff did not inform her of the risks and possible outcome of the procedure is not credible, and that Plaintiff Novak has not rebutted the presumption that she gave valid consent. Based on the medical records and the testimony at trial, this Court finds that Plaintiff Novak was properly advised of the risks and likely outcomes of the procedure, and that she made a reasonable decision under the circumstances to undergo the surgery. This Court therefore finds in favor of Defendant with regard to Plaintiff Novak's informed consent claim.

## VIII. Unnecessary Surgery and Negligent Performance Claims

### A. Findings of Fact

Plaintiffs also allege that Defendant's recommendation and performance of Plaintiff Novak's hysterectomy constituted medical malpractice because the procedure was medically

---

[9] This Court is also persuaded by the fact that Plaintiff Novak has undergone a number of plastic surgeries, including procedures at the Miami VA Medical Center within approximately one year of the hysterectomy. [Tr. Exh. 1 (vol. 8) at 01321 (August 28, 1997 neck liposuction), 01342 (August 15, 1997 liposuction to correct breast deformities).] At trial, she admitted that she went through the informed consent process for the plastic surgeries. Plaintiff Novak has not claimed that she was incapable of giving informed consent to those procedures.

unnecessary and that the procedure was performed in a negligent manner because her bladder was scrapped during the procedure.

B.   **Conclusions of Law**

1.   **Statute of Limitations**

a.   As discussed above, Plaintiff Novak was required to submit her administrative claims within two years after her claims accrued.  On July 22, 1996, Plaintiff Novak told Joan Watson at the Honolulu VA that her bladder had been "scrapped" during the hysterectomy and that she was experiencing bladder discomfort.  [Tr. Exh. 1 at 01851.]  Thus, her claim that the hysterectomy was negligently performed accrued no later than July 22, 1996, by which time Plaintiff Novak's injury had manifested itself and she was aware of the facts that caused her injury.  See Kubrick, 444 U.S. at 122; Augustine, 704 F.2d at 1078.  The Court finds that Plaintiff Novak's negligent performance claim is time-barred because she failed to file her administrative complaint within two years of that date.  For the sake of completeness, however, the Court will address Plaintiffs' proof in support of this claim.

b.   With regard to Plaintiff Novak's unnecessary surgery claim, it is unclear when the facts supporting this claim became available to her.  The Court will therefore assume for the sake of argument that Plaintiff Novak's administrative claim was timely.

53

2.    Under Florida law, a plaintiff must produce expert testimony to establish that a medical procedure was unnecessary. See Borges v. Jacobs, 483 So.2d 773, 774 (Fla. Dist. Ct. App. 1986).  Thus, Plaintiffs were also required to produce expert testimony to establish the standard of care for the performance of the hysterectomy.  See Torres, 903 So.2d at 1067-68.  The only expert testimony Plaintiffs provided was that of Dr. Bursztajn. As stated above, Dr. Bursztajn is not an expert in gynecology or surgery.  Plaintiffs therefore failed to carry their burden to provide qualified expert testimony that Plaintiff Novak's hysterectomy was medically unnecessary and that the hysterectomy was performed in a negligent manner.  The Court therefore finds in favor of Defendant with respect to these claims.

## IX.    Conclusions of Law Regarding Plaintiff Alejandro's Claim

Plaintiff Alejandro asserts a claim for loss of consortium.  [Complaint at ¶ 41.]  This claim is derivative of Plaintiff Novak's claim for personal injury.  See Leslie v. Estate of Tavares, 91 Hawai`i 394, 403-04 n.11, 984 P.2d 1220, 1229-30 n.11 (1999) (citing Tabieros v. Clark Equip. Co., 85 Hawai`i 336, 361, 944 P.2d 1279, 1304 (1997) (noting that, "[u]nder Hawai`i law, a spouse's claim of emotional distress, based on an injury to her husband, is a 'derivative' claim sounding in tort" (citations omitted))).  As Plaintiff Novak cannot recover for her claims, Plaintiff Alejandro is likewise

54

precluded from recovery.  See <u>Omori v. Jowa Hawai`i Co., Ltd.</u>, 91 Hawai`i 146, 146-47, 981 P.2d 703, 703-04 (1999) ("'The majority rule is that a plaintiff in a [derivative-injury tort] action can only recover if the tortious harm the [injured party] suffered would have entitled the [injured party] to maintain an action against the defendant.'" (quoting <u>Winters v. Silver Fox Bar</u>, 71 Haw. 524, 536, 797 P.2d 51, 56 (1990)) (alterations in original)).  <u>Accord</u> <u>ACandS, Inc. v. Redd</u>, 703 So.2d 492, 493-94 (Fla. Dist. Ct. App. 1997) (noting that, under Florida law, a loss of consortium is a derivative claim that is dependent on the spouse's ability to recover in a cause of action against the same defendant).  The Court therefore finds in favor of Defendant as to Plaintiff Alejandro's claim.

**<u>ORDER</u>**

AND NOW, following the conclusion of a bench trial in this matter, and in accordance with the foregoing Findings of Fact and Conclusions of Law, it is HEREBY ORDERED that judgment shall enter in favor of Defendant and against Plaintiffs in the above matter.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAI`I, August 30, 2006.



_/S/ Leslie E. Kobayashi_

Leslie E. Kobayashi
United States Magistrate Judge

**NIDIA I. TORO, ETC., ET AL. V. UNITED STATES OF AMERICA; CIVIL NO. 03-00030 LEK; FINDINGS OF FACT AND CONCLUSIONS OF LAW**

56